1 **GARY BRICKWOOD (SBN 94892)**
**BRICKWOOD LAW OFFICE**
2 1135 Pine St., Suite 210
Redding, CA 96001
3 Tel  (530) 245-1877
Fax (530) 245-1879
4

5 Attorneys for Defendants
ANDREA L. SILVER MERRILL
6 and RICHARD WALTON MERRILL

7

8

9 **IN THE UNITED STATES DISTRICT COURT**

10 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

11 DIMAS O'CAMPO,                                     ) Case No.:  2:16-cv-01769-JAM CMK
                                                     )
12        Plaintiff,                                 )
                                                     ) **DEFENDANTS ANDREA L. SILVER**
13        vs.                                        ) **MERRILL AND RICHARD WALTON**
                                                     ) **MERRILL'S FIRST AMENDED**
14 STEVE DE CLERCK ENTERPRISES,                      ) **ANSWER TO PLAINTIFF'S**
   INC. dba TACO BELL #021286;                       ) **COMPLAINT AND CROSS-CLAIM**
15 ANDREA L. SILVER aka ANDREA                       )
   L. SILVER MERRILL, SUCCESSOR                      )
16 TRUSTEE of the LUCILLE F.                          )
   MORGAN IRREVOCABLE LIVING                         )
17 TRUST NUMBER TWO; RICHARD                         )
   WALTON MERRILL,                                   )
18                                                   )
          Defendants.                                )
19                                                   )
   _____                )
20 ANDREA L. SILVER aka ANDREA L.                    )
   SILVER MERRILL, SUCCESSOR TRUSTEE                 )
21 of the LUCILLE F. MORGAN                          )
   IRREVOCABLE LIVING TRUST NUMBER                   )
22 TWO; RICHARD WALTON MERRILL,                      )
                                                     )
23        Cross-Claimants,                           )
                                                     )
24        vs.                                        )
                                                     )
25 C&K MARKETS, INC., dba RAY'S FOOD                 )
   PLACE; AND ROES 1 through 10,                     )
26                                                   )
          Cross-Defendants.                          )
27 _____                 )

28

---

1      Defendants RICHARD WALTON MERRILL ("R. Merrill") and ANDREA L. SILVER

2 aka ANDREA L. SILVER MERRILL, SUCCESSOR TRUSTEE of the LUCILLE F. MORGAN

3 IRREVOCABLE LIVING TRUST NUMBER TWO ("A. Merrill") (collectively "Defendants")

4 request a jury trial.

5      Defendants answer Plaintiff's Complaint and allege as follows:

6                      **I.    SUMMARY**

7      1. Defendants admit that this lawsuit alleges discrimination against Plaintiff Dimas

8 O'Campo at Taco Bell #021286, located at 301 West Lake Street Mt. Shasta, CA 96067.

9 Defendants deny that Plaintiff was discriminated against.

10      2. Defendants admit that Plaintiff seeks damages, injunctive and declaratory relief,

11 attorney fees and costs pursuant to the Americans with Disabilities Act of 1990 and related

12 California statutes. Defendants deny that Plaintiff is entitled to the relief sought.

13                      **II. JURISDICTION**

14      3. Defendants admit that this Court has jurisdiction of ADA claims under 28 U.S.C. §

15 1331 and 1343. Defendants deny that they have violated Plaintiff's rights under federal or state

16 law.

17      4. Defendants admit that Plaintiff seeks to invoke supplemental jurisdiction over

18 California state law claims. Defendants admit that this Court may invoke supplemental

19 jurisdiction for claims brought under state law arising from the same nucleus of operative facts

20 pursuant to 28 U.S.C. § 1367. Defendants deny that they have violated Plaintiff's rights under

21 federal or state law.

22      5. Defendants lack sufficient information or belief to admit or deny the allegations of

23 Paragraph 5 and on that ground, deny the allegations.

24                      **III. VENUE**

25      6. Defendants lack sufficient information or belief to admit or deny the allegations of

26 Paragraph 6 and on that ground, deny the allegations.

27 *///*

28 *///*

---

1

**IV. PARTIES**

2     7. Defendants deny the allegations of Paragraph 7.

3     8. Defendants lack sufficient information or belief to admit or deny the allegations of

4   Paragraph 8 and on that ground, deny the allegations. To the extent that Paragraph 8 states a legal

5   conclusion regarding Plaintiff's status as "physically disabled" under applicable California and

6   United States laws, no answer is required.

7

**V. FACTS**

8     9. Defendants lack sufficient information or belief to admit or deny the allegations of

9   Paragraph 9 and on that ground, deny the allegations.

10    10. Defendants lack sufficient information or belief to admit or deny the allegations of

11  Paragraph 10 and on that ground, deny the allegations.

12    11. Defendants lack sufficient information or belief to admit or deny the allegations of

13  Paragraph 11 and on that ground, deny the allegations.

14    12. Defendants lack sufficient information or belief to admit or deny the allegations of

15  Paragraph 12 and on that ground, deny the allegations.

16    13. Defendants deny the allegations of Paragraph 13.

17    14. Defendants deny the allegations of Paragraph 14.

18

**VI. FIRST CLAIM**

19

**Americans with Disabilities Act of 1990**

20

Denial of "Full and Equal" Enjoyment and Use

21    15. Defendants incorporate by reference each and every response contained in the

22  foregoing paragraphs.

23    16. Paragraph 16 contains a statement of law which Defendants neither admit nor deny.

24    17. Defendants deny the allegations of Paragraph 17.

25

Failure to Remove Architectural Barriers in an Existing Facility

26    18. Paragraph 18 contains a statement of law which Defendants neither admit nor deny.

27    19. Paragraph 19 contains a statement of law which Defendants neither admit nor deny.

28    20. Defendants deny the allegations of Paragraph 20.

---

DEFENDANTS ANDREA L. SILVER MERRILL AND RICHARD WALTON MERRILL'S FIRST AMENDED
ANSWER TO PLAINTIFF'S COMPLAINT AND CROSS-CLAIM

3

1    21. Defendants deny the allegations of Paragraph 21.

2    ### Failure to Design and Construct an Accessible Facility

3    22. Defendants lack sufficient information or belief to admit or deny the allegations in

4    Paragraph 22 and, on that ground deny the allegations.

5    23. Paragraph 23 contains a statement of law which Defendants neither admit nor deny.

6    24. Defendants deny the allegations of Paragraph 24.

7    ### Failure to Make an Altered Facility Accessible

8    25. Defendants lack sufficient information or belief to admit or deny the allegations in

9    Paragraph 25 and, on that ground deny the allegations.

10   26. Paragraph 26 contains a statement of law which Defendants neither admit nor deny.

11   27. Defendants deny the allegations of Paragraph 27.

12   ### Failure to Modify Existing Policies and Procedures

13   28. Paragraph 28 contains a statement of law which Defendants neither admit nor deny.

14   29. Defendants deny the allegations of Paragraph 29.

15   30. Defendants admit that Plaintiff seeks all relief available under the ADA. Defendants

16   deny that Plaintiff is entitled to the relief sought.

17   31. Defendants admit that Plaintiff seeks declaratory relief in order to pursue damages

18   under California state law. Defendants deny that Plaintiff is entitled to the relief sought.

19   ### VII.    SECOND CLAIM

20   ### Disabled Persons Act

21   32. Defendants incorporate by reference each and every response contained in the

22   foregoing paragraphs.

23   33. Paragraph 33 contains a statement of law which Defendants neither admit nor deny.

24   34. Paragraph 34 contains a statement of law which Defendants neither admit nor deny.

25   35. Paragraph 35 contains a statement of law which Defendants neither admit nor deny.

26   36. Defendants deny the allegations of Paragraph 36.

27   ///

28   ///

DEFENDANTS ANDREA L. SILVER MERRILL AND RICHARD WALTON MERRILL'S FIRST AMENDED
ANSWER TO PLAINTIFF'S COMPLAINT AND CROSS-CLAIM

4

37. Defendants admit that Plaintiff seeks actual damages, statutory minimum damages, declaratory relief, and any other remedy available under California Civil Code § 54.3 Defendants deny that Plaintiff is entitled to the relief sought.

38. Defendants admit that Plaintiff seeks to enjoin Defendants from violating the Disabled Persons Act and to recover reasonable attorneys' fees. Defendants deny that Plaintiff is entitled to the relief sought.

## VIII.   THIRD CLAIM

### Unruh Civil Rights Act

39. Defendants incorporate by reference each and every response contained in the foregoing paragraphs.

40. Paragraph 40 contains a statement of law which Defendants neither admit nor deny.

41. Paragraph 41 contains a statement of law which Defendants neither admit nor deny.

42. Paragraph 42 contains a statement of law which Defendants neither admit nor deny.

43. Defendants deny the allegations of Paragraph 43.

44. Defendants deny the allegations of Paragraph 44.

45. Defendants admit that Plaintiff seeks statutory minimum damages. Defendants deny the remaining allegations of Paragraph 45 and deny that Plaintiff is entitled to the relief sought.

46. Defendants admit that Plaintiff seeks to enjoin Defendants from violating the Unruh Act and to recover reasonable attorneys' fees and costs. Defendants deny that Plaintiff is entitled to the relief sought.

## IX.     FOURTH CLAIM

### Denial of Full and Equal Access to Public Facilities

47. Defendants incorporate by reference each and every response contained in the foregoing paragraphs.

48. Paragraph 48 contains a statement of law which Defendants neither admit nor deny.

49. Paragraph 49 contains a statement of law which Defendants neither admit nor deny.

50. Defendants lack sufficient information or belief to admit or deny the allegations in Paragraph 50 and, on that ground deny the allegations.

51. Defendants admit that Plaintiff seeks injunctive relief and to recover reasonable attorneys' fees and costs. Defendants deny the remaining allegations of Paragraph 51 and deny that Plaintiff is entitled to the relief sought.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

1. Defendants allege the Complaint fails to state a cause of action against these answering Defendants.

### SECOND AFFIRMATIVE DEFENSE

2. Defendants allege on information and belief that Plaintiff's claims for relief are barred because Defendants do not maintain possession or control of the "building, structure, facility, complex, property, land, development, and/or surrounding business complex" referred to as "the Restaurant" in Paragraph 1 of Plaintiff's Complaint (hereinafter "the Restaurant" or "the subject property").

### THIRD AFFIRMATIVE DEFENSE

3. Defendants allege Plaintiff lacks standing.

### FOURTH AFFIRMATIVE DEFENSE

4. Defendants allege Plaintiff is barred from seeking relief by the doctrine of unclean hands.

### FIFTH AFFIRMATIVE DEFENSE

5. Defendants allege on information and belief that Plaintiff's Complaint is barred by the statute of limitations.

### SIXTH AFFIRMATIVE DEFENSE

6. Defendants allege Plaintiff is estopped by his own conduct to claim any right to damages or any relief against these answering Defendants.

///

///

///

///

**SEVENTH AFFIRMATIVE DEFENSE**

7. Defendants allege that the Complaint, including each claim for relief alleged therein, and the alleged conduct underlying the claims was caused or contributed to by other persons and entities and damages against these answering Defendants and damages, if any, should be reduced in direct proportion to their fault.

**EIGHTH AFFIRMATIVE DEFENSE**

8. Defendants allege that to the extent Plaintiff suffered any detriment, such detriment was caused or contributed to by Plaintiff's own negligence and damages, if any, should be reduced in direct proportion to his fault.

**NINTH AFFIRMATIVE DEFENSE**

9. Defendants allege on information and belief that Plaintiff failed to take all reasonable steps necessary to mitigate, limit, minimize or avoid damages he alleges to have suffered as the result of Defendants alleged conduct.

**TENTH AFFIRMATIVE DEFENSE**

10. Defendants allege on information and belief that the Restaurant was designed, constructed and first occupied prior to January 26, 1993.

**ELEVENTH AFFIRMATIVE DEFENSE**

11. Defendants allege, without admitting that Plaintiff has sustained any injury or damage, that the purported acts or omissions of these answering Defendants were not the proximate cause of any injury or damage to Plaintiff.

**TWELFTH AFFIRMATIVE DEFENSE**

12. Defendants allege on information and belief that Plaintiff's claims are barred for failure to join necessary or indispensable parties.

**THIRTEENTH AFFIRMATIVE DEFENSE**

13. Defendants allege on information and belief that removal of the alleged architectural barriers to equal access is not readily achievable.

///

///

DEFENDANTS ANDREA L. SILVER MERRILL AND RICHARD WALTON MERRILL'S FIRST AMENDED ANSWER TO PLAINTIFF'S COMPLAINT AND CROSS-CLAIM

7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOURTEENTH AFFIRMATIVE DEFENSE**

14. Defendants allege on information and belief that equivalent facilitation was provided to persons with disabilities.

**FIFTEENTH AFFIRMATIVE DEFENSE**

15. Defendants allege on information and belief that any alterations to the Restaurant met the "maximum extent feasible" standard.

**SIXTEENTH AFFIRMATIVE DEFENSE**

16. Defendants allege on information and belief that removal of the alleged architectural barriers would impose an undue burden upon Defendants.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

17. Defendants allege on information and belief that the modifications requested by Plaintiff would fundamentally alter the nature of the Restaurant's business.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

18. Defendants allege on information and belief that Plaintiff's claims are moot.

**NINETEENTH AFFIRMATIVE DEFENSE**

19. Defendants allege on information and belief that Plaintiff voluntarily and with full knowledge of the matters referred to in the Complaint assumed any and all of the risks, hazards, and perils of the circumstances referred to in the Complaint.

**TWENTIETH AFFIRMATIVE DEFENSE**

20. Defendants allege on information and belief that Plaintiff's Complaint is not brought in good faith, is frivolous, and entitles these answering Defendants to receive reasonable expenses and attorneys' fees pursuant to, *inter alia*, California Civil Code section 55 *et seq.*

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

21. Defendants allege on information and belief that Plaintiff was not personally deterred, impeded, or deprived of equal access to the Restaurant while seeking goods or services on a particular occasion as alleged in Plaintiff's Complaint. Defendants allege on information and belief that the Complaint is barred because Plaintiff visited the subject property for the purpose of instituting the instant litigation. Defendants allege on information and belief that Plaintiff, or

DEFENDANTS ANDREA L. SILVER MERRILL AND RICHARD WALTON MERRILL'S FIRST AMENDED ANSWER TO PLAINTIFF'S COMPLAINT AND CROSS-CLAIM

8

his agents, presented himself at the Restaurant for the specific purpose of looking for discriminatory access barriers rather than to avail himself of the goods and services offered at the Restaurant thereby precluding Plaintiff under California law from obtaining the statutory damages requested in his Complaint.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

22. Defendants allege that supplemental jurisdiction of the state law claims is improper.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

23. Defendants allege on information and belief that Plaintiff failed to exhaust all litigation prerequisites required by section 55.3(b) of the California Civil Code, as amended.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

24. Defendants allege on information and belief, without admitting that any architectural access barriers exist, that to the extent such architectural barriers alleged by Plaintiff exist, such barriers are within acceptable measurements and/or construction industry tolerances.

### TWENTY-FIFTH AFFIRMATIVE DEFENSE

25. Given the conclusory nature of certain allegations in Plaintiff's Complaints, Defendants have insufficient knowledge and information regarding additional, but yet unidentified, defenses available. Defendants reserve the right to assert additional defenses in the event discovery reveals or indicates that such defenses would be appropriate.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

26. Defendants allege on information and belief that a failure, if any, to be in strict compliance with the barrier removal standard is excused as a result of obtaining an evaluation of the property to identify needed alteration, if any, formulation of a plan to make any such alterations, the completion of some alterations and ongoing improvement efforts as a part of the overall improvement plan.

///

///

///

///

DEFENDANTS ANDREA L. SILVER MERRILL AND RICHARD WALTON MERRILL'S FIRST AMENDED ANSWER TO PLAINTIFF'S COMPLAINT AND CROSS-CLAIM

9

**PRAYER**

WHEREFORE, Defendants pray for judgment as follows:

1.      That Plaintiff takes nothing by the Complaint;

2.      That Plaintiff's Complaint be dismissed in its entirety with prejudice;

3.      That Defendants be awarded costs of suit, including reasonable attorney's fees; and

4.      That Defendants be awarded such other relief as the Court deems just.

**CROSS-CLAIMS**

Cross-Claimants RICHARD WALTON MERRILL ("R. Merrill") and ANDREA L. SILVER aka ANDREA L. SILVER MERRILL, SUCCESSOR TRUSTEE of the LUCILLE F. MORGAN IRREVOCABLE LIVING TRUST NUMBER TWO ("A. Merrill") (collectively "Cross-Claimants" or the "Merrills") allege as follows:

**Jurisdiction and Venue**

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1343 for alleged violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*

2.      This Court has supplemental jurisdiction for claims brought under California law arising from the same nucleus of operative facts and the same transactions pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

**Parties**

4.      Cross-Claimant Richard Walton Merrill is an individual residing in Idaho. Cross-Claimant Andrea L. Silver aka Andrea L. Silver Merrill, as Successor Trustee of the Lucille F. Morgan Irrevocable Living Trust Number Two (the "Trust") is an individual residing in Idaho. The Trust was formed and administered in California.

1        5.      Cross-Claimants are informed and believe and on that basis allege that Cross-

2  Defendant C&K MARKET, INC. ("C&K") is a corporation formed and operating under the laws

3  of the State of Oregon.

4        6.      Cross-Claimants are informed and believe and on that basis allege that at all

5  relevant times herein mentioned, C&K is the owner and/or operator of the Mt. Shasta Shopping

6  Center including the buildings, parking areas, paving, lighting, landscaping and drainage system

7  and that the "the Restaurant" identified in Plaintiff's Complaint, Taco Bell #021286, located at

8  301 West Lake Street Mt. Shasta, California, is located in the Mt. Shasta Shopping Center.

9        7.      The true names and capacities, whether individual, corporate, or otherwise, of

10  ROES 1 to 10, inclusive, are presently unknown to Cross-Claimants, who therefore sue said

11  Cross-Defendants by such fictitious names. Cross-Claimants are informed and believe and on that

12  basis allege that each of the Cross-Defendants designated herein as a ROE are jointly and

13  severally responsible for the wrongs alleged in Plaintiff's Complaint in the above entitled action.

14  Cross-Claimants will seek leave of Court to amend this Answer and Cross-Claim to show the true

15  names and capacities of the ROE Cross-Defendants when they are ascertained.

16

17                             **General Allegations**

18        8.      Cross-Claimants are informed and believe, and on that basis allege that by

19  assignment, Cross-Defendant C&K Market, Inc. is a party to the Mt. Shasta Shopping Center

20  Ground Lease dated October 14, 1976, as amended (the "Lease") and assumed the rights and

21  obligations of the Tenant under the Lease. The Lease dated October 14, 1976, the Addendum

22  dated October 14, 1976, the Second Addendum dated October 14, 1976, the Third Addendum

23  dated March 4, 1977, the Fourth Addendum dated October 9, 2007, and the Fifth Addendum

24  effective September 30, 2014 are attached hereto collectively as **Exhibit A**.

25        9.      The Lease required Tenant to construct a modern, first-class shopping center and

26  a parking area including paving, lighting, landscaping, and installation of drainage system(s), at

27  the sole cost and expense of Tenant. The Lease further required that all installation and

28  construction to be made by Tenant shall comply with and be in accordance with applicable

1   building ordinances and laws. (Exh. A, Lease at Art. IV).

2        10.    The parties agreed that the Lease was "a ground rental" and that the Landlord

3   "shall not be required to repair or rebuild, or make any repairs, replacements or renewals of any

4   nature or description whatsoever to the lease premises, whether ordinary or extraordinary, or to

5   maintain the leased premises in any way, and Tenant hereby expressly waives the right to make

6   repairs at the expense of Landlord as provided for in any statute or law in effect at the time of the

7   execution of this lease, or any other statute or law which may be hereafter enacted." (Exh. A,

8   Lease at Art. VII).

9        11.    Under the Lease, the Tenant agrees to strictly conform to all laws and ordinances

10   and all orders, regulations and requirements of any and every legal, governmental or military

11   board, body, commission or officer relating to, affecting or controlling the construction,

12   reconstruction, replacement, changes in construction of, repair, maintenance, condition,

13   equipment, protection, occupancy or use of, any and every building, structure or improvement

14   that is, or that may be placed or maintained upon said premises, or relating to, affecting or

15   controlling the improvement, occupancy, use or condition of, or any work or operation in or upon

16   said land and premises or said buildings or improvements, or any sidewalk or street surrounding

17   or adjoining the same. The Tenant agrees to pay and discharge and to keep the Landlord and the

18   said land and premises and every part thereof and any and every building, structure and

19   improvement thereon, free and harmless from any and every fine, penalty, assessment, charge,

20   cost, expense, outlay or damage that may be charged, adjudged, imposed or assessed, or that may

21   be incurred for a violation of any of said laws. (Exh. A, Lease at Art. IX).

22        12.    Cross-Claimants are informed and believe and on that basis allege that C&K is a

23   party to a ground lease with Co-Defendant Steve De Clerck Enterprises, Inc. dba Taco Bell

24   #021286 for the parcel depicted as TB/KFC on the Mt. Shasta Shopping Center design plan.

25        13.    On July 28, 2016, Plaintiff Dimas O'Campo ("Plaintiff") brought a civil rights

26   action against Cross-Claimants alleging discrimination at the building, structure, facility,

27   complex, property, land, development, and/or surrounding business complex known as Taco Bell

28   #021286, located at 301 West Lake Street Mt. Shasta, California. Plaintiff seeks damages,

---

1    injunctive and declaratory relief, and attorney fees and costs under the Americans with

2    Disabilities Act of 1990 and related California statutes (the "Underlying Action").

3

4                                    **First Cause of Action**

5                        **(Express Contractual Indemnity against C&K)**

6         14.    Cross-Claimants reallege and incorporate by reference each and every allegation

7    set forth in paragraphs 1 through 12 of the Cross-Claim.

8         15.    The Lease obligates the Tenant, Cross-Defendant C&K, to pay, and to protect,

9    indemnify and save harmless Cross-Claimants from and against, any and all liabilities, damages,

10   costs, expenses (including any and all attorney's fees and expenses of Tenant and any and all

11   attorney's fees and expenses of Landlord), causes of action, suits, claims, demands or judgments

12   of any nature whatsoever arising from injury to or the death of, persons or the damage to property

13   on the leased premises. (Exh. A, the Lease, Art. V).

14        16.    The damages alleged by Plaintiff in the Underlying Action, to the extent that they

15   have been defined by Plaintiff or otherwise, involve damages purportedly caused by C&K arising

16   out of and relating to C&K's obligations to construct and maintain the Premises, including "the

17   Restaurant", in compliance with all applicable laws and to indemnify Cross-Claimants for injuries

18   due to Cross-Defendant's acts or omissions.

19        17.    Cross-Claimants seek for Cross-Defendant to defend them in the Underlying

20   Action by Plaintiff and to indemnify and hold harmless Cross-Claimants for any damages or loss

21   by way of settlement, judgment or other adverse decision rendered against Cross-Claimants in

22   this action, to the extent that such damages or loss fall within the scope of the indemnity provided

23   under the Lease or under any other obligations, whether express or implied.

24        18.    Cross-Claimants have complied with all the terms and conditions of the Lease

25   agreement with Cross-Defendant, except those obligations that have been excused or prevented

26   by Cross-Defendant, those obligations that Cross-Defendant has waived by its conduct, or those

27   obligations that Cross-Defendant is estopped from asserting.

28   ///

19.     Cross-Claimants are informed and believe and on that basis allege that Cross-Defendant breached its obligations under the terms of the Lease to the extent that Cross-Claimants are found liable for the damages alleged in Plaintiff's Complaint.

20.     Cross-Claimants have incurred and will continue to incur attorneys' fees, costs and expenses in the defense of the underlying action and in the prosecution of this Cross-Complaint. Therefore, Cross-Claimants have been damaged and will continue to be damaged in an amount to be shown according to proof at time of trial.

### Second Cause of Action

### (Breach of Lease/Implied Contractual Indemnity against C&K)

21.     Cross-Claimants reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 19 of the Cross-Claim.

22.     Under the terms of the Lease, Cross-Defendant is and was obligated to construct and maintain the Premises, including "the Restaurant", in compliance with all applicable laws.

23.     Cross-Defendant has breached the Lease by failing to perform its obligations to construct and maintain the Premises in compliance with all applicable laws.

24.     Cross-Claimants have at all times complied with and performed all the covenants and obligations contained in the Lease except those obligations that have been excused or prevented by Cross-Defendant, those obligations that Cross-Defendant has waived by its conduct, or those obligations that Cross-Defendant is estopped from asserting.

25.     Cross-Claimants have and continue to sustain damages as a result of Cross-Defendant's contractual breach.

26.     Based on the theory of implied contractual indemnity, Cross-Defendant is obligated to assume and pay any damages Cross-Claimants have incurred and continue to incur as a result of Cross-Defendant's breach.

///

///

///

**Third Cause of Action**

**(Equitable Indemnity against All Defendants)**

27.     Cross-Claimants reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 25 of the Cross-Claim.

28.     Cross-Claimants are informed and believe and on that basis allege that each of the Cross-Defendants is negligently, intentionally, strictly or vicariously liable and/or otherwise legally responsible in some manner for each and every act, omission, obligation, event or happening set forth in Plaintiff's Complaint.

29.     Cross-Claimants are informed and believe and on that basis allege that they have been made Defendants by Plaintiff in this action as a result of the actions and/or inactions of Cross-Defendants which are the subject of the Underlying Action. The damages alleged by Plaintiff in the Underlying Action involve damages caused by Cross-Defendants.

30.     Cross-Defendants owe Cross-Claimants an equitable right of indemnity for any and all losses and/or damages incurred by Cross-Claimants as a result of conduct or actions of Cross-Defendants.

31.     Cross-Claimants seek for Cross-Defendants to indemnify them for any damages or loss by way of settlement, judgment or other adverse decision rendered against Cross-Claimants in the Underlying Action.

32.     Cross-Claimants have incurred and will continue to incur attorney's fees, costs and expenses in the defense of the Underlying Action and in prosecution of this Cross-Complaint. Therefore, Cross-Claimants have been damaged and will continue to be damaged in an amount to be shown according to proof at time of trial.

**Fourth Cause of Action**

**(Declaratory Relief against All Defendants)**

33.     An actual controversy exists between the parties hereto relating to their rights, duties, and liabilities. Cross-Claimants contend that if they are held liable and suffer judgment in the Underlying Action, Cross-Claimants are entitled to be indemnified as herein above alleged, and are entitled to judgment over and against Cross-Defendants, and each of them, in a like

1   amount, and in addition, are entitled to judgment for costs and expenses in defending the

2   Underlying Action, including reasonable attorney's fees. Cross-Claimants are informed and

3   believe, and on that basis allege that Cross-Defendants contend to the contrary.

4

5       WHEREFORE, Cross-Claimants pray for judgment as follows:

6       1.      That Cross-Claimants be fully indemnified by Cross-Defendants, and each of

7   them, for the amount of any compromise, settlement, or judgment which may be rendered against

8   Cross-Claimants in the Underlying Action;

9       2.      For costs of suit;

10      3.      For reasonable attorney's fees and investigative costs;

11      4.      That the court determine the rights, duties and obligations of the parties to this

12  action; and

13      5.      For such other and further relief as the court may deem just and proper.

14

15  DATED: May 19, 2017                 BRICKWOOD LAW OFFICE

16

17                                          /s/      GARY BRICKWOOD
                                        _____

18                                      GARY BRICKWOOD
                                        Attorneys for Defendants

19                                      ANDREA L. SILVER MERRILL
                                        and RICHARD WALTON MERRILL

20

21

22

23

24

25

26

27

28

---

DEFENDANTS ANDREA L. SILVER MERRILL AND RICHARD WALTON MERRILL'S FIRST AMENDED
ANSWER TO PLAINTIFF'S COMPLAINT AND CROSS-CLAIM

16

EXHIBIT A

Lease

Mt Shasta

SHOPPING CENTER GROUND LEASE
INDEX

| | ARTICLE | |
|---|---|---|
| 1 | I | TERM |
| 2 | II | RENT |
| 3 | III | TAXES & ASSESSMENTS |
| 4 | IV | CONSTRUCTION OF NEW IMPROVEMENTS AND GRANT OF EASEMENTS AND STREET AND WATERLINE |
| 5 | V | INDEMNIFICATION AND INSURANCE |
| 6 | VI | FIRE OR OTHER CASUALTY |
| 7 | VII | GROUND RENT, NET LEASE AND LANDLORD NOT TO MAINTAIN |
| 8 | VIII | TITLE TO NEW IMPROVEMENTS, INSPECTION OF THE PREMISES, AND END OF TERM |
| 9 | IX | USE OF PREMISES - COMPLIANCE WITH LAWS AND REGULATIONS, INDEMNIFICATION OF LANDLORD - RESTRICTED ACTIVITIES |
| 10 | X | MECHANICS' AND OTHER LIENS |
| 11 | XI | ASSIGNMENT AND SUBLETTING |
| 12 | XII | SUBORDINATION OF THE FEE |
| 13 | XIII | PRIORITY OF LIEN OR LEASE |
| 14 | XIV | CONDEMNATION |
| 15 | XV | SERVICE OF NOTICES |
| 16 | XVI | CONTINUING OFFER |
| 17 | XVII | CERTIFICATE OF LANDLORD |
| 18 | XVIII | QUIET ENJOYMENT |
| 19 | XIX | SHORT FORM OF LEASE |
| 20 | XX | LANDLORD MAY CURE DEFAULTS |
| 21 | XXI | DEFAULTS |
| 22 | XXII | NOTICE AND RIGHT TO CURE |
| 23 | XXIII | LESSOR'S REMEDIES - NOTICE OF DEFAULT, DEFAULT - UNAVOIDABLE DEFAULT |
| 24 | XXIV | PERMISSIVE REMOVAL OF TENANT'S PROPERTY |
| 25 | XXV | OFF-SITE IMPROVEMENTS |
| 26 | XXVI | FIRST RIGHT OF REFUSAL TO PURCHASE |
| 27 | XXVII | MISCELLANEOUS COVENANTS |

SHOPPING CENTER GROUND LEASE

THIS LEASE is entered into this _17_ day of _October_

1 1976, by LUCILLE F. MORGAN, and by ELIZABETH D. WELSH and POLLY WELSH

2 McGILWAY, as Successor Trustees of the HERBERT NUAN MERRILL Testa-

3 mentary Trusts, and by ELIZABETH D. WELSH and POLLY WELSH McGILWAY

4 as Co-Trustees of the LUCILLE F. MORGAN Irrevocable Living Trust

5 Number Two, herein called "Landlord" or "Lessor," and by LOUIS A.

6 HABASH and MARY R. HABASH, herein called "Tenant" or "Lessee."

7 W I T N E S S E T H:

8 In consideration of the rents herein reserved and the

9 covenants and agreements herein contained on the part of Land-

10 lord and Tenant to be kept, observed and performed, Landlord has

11 demised and leased, and by these presents does demise and lease

12 unto Tenant and the Landlord has hired and taken, and by these

13 presents does hire and take from Landlord the real property,

14 situate, lying and being in the Town of Mount Shasta, County of

15 Siskiyou, State of California, more particularly described in

16 Exhibit "A" and Exhibit "B", which are attached hereto and

17 incorporated by reference herein, for the term herein set forth.

18 Landlord specifically reserves all mineral rights to such real

19 property, but

20 ARTICLE I

21 TERM

22 (a) _Preliminary Term_. The Preliminary Term of this

23 lease shall commence on the date of execution hereof and shall

24 end at midnight on the day upon which Tenant _Opens_

25 notice to Landlord of the opening by Tenant of its shopping

26 center for business on the demised premises; provided, however,

27 that in no event shall the Preliminary Term be longer in length

28 than four hundred fifty (450) days.

29 During such Preliminary Term, Tenant shall diligently

30 commence and prosecute the construction of improvements to com-

31 pletion, and shall comply with the requirements of all appro-

32 priate authorities in the completion of such construction.

-1-

(b)  Basic Term.  The Basic Term of the lease shall com-
mence upon the expiration of the Preliminary Term hereof and
shall continue for a period of fifty-five (55) years thereafter,
subject however, to Tenant's right to earlier terminate such
Basic Term after the expiration of the first thirty-five (35)
years hereof.  Such right to terminate shall exist only if
the construction and permanent loan for the construction of the
shopping center has been paid in full and the deeds of trust
securing same against the premises have been reconveyed/  Further,
such right to so terminate shall be exercised by Tenant notifying
Landlord in writing at least sixty (60) days in advance of the
effective date of such termination; in the event Tenant does
not so notify Landlord, the term hereof shall continue for
consecutive additional five year periods and upon the expira-
tion of each of such periods, Tenant shall have the right to
terminate this lease pursuant to the notice procedure set forth
in this subparagraph (b) of this Article  Forthwith upon the
commencement of the Basic Term of the lease, the parties shall
execute a document, suitable for recording, establishing of
record the date of commencement of such Basic Term.

(c)  The Preliminary Term shall be extended a
reasonable number of days (not exceeding 150 days) when the
following occurrences have resulted in a delay: governmental
regulations, inability to procure labor or materials, strikes,
acts of God, or other causes similar or dissimilar beyond the
control of Landlord or Tenant.

ARTICLE II

RENT

(a)  In the event of any termination of this lease, for
any reason whatsoever, Tenant hereby assigns to Landlord all of
Tenant's right, title and interest in and to any and all plans,
tests, surveys, designs, drawings, models, sketches and space

1  fications made or prepared for Tenant or by Tenant's order with
2  respect to the demised premises or any improvement to be con-
3  structed thereon.  This assignment is made without liability
4  to Landlord, who shall not be liable to the person or persons
5  who made or prepared such plans, tests, surveys, designs, draw-
6  ings, models, sketches or specifications.  Tenant shall in-
7  clude the provisions of this paragraph in any agreement Tenant
8  may enter into with the architects or engineers engaged by
9  Tenant or on behalf of Tenant, which agreement shall further pro-
10  vide that such architects and engineers shall promptly honor
11  Landlord's written notice and demand, when served by regis-
12  tered mail, return receipt requested, that the lease has ter-
13  minated, and that all such plans, tests, surveys, designs,
14  drawings, models, sketches or specifications, to the extent
15  of the Tenant's right, title and interest therein be promptly
16  delivered to Landlord.

17      (b)  During the Preliminary Term hereof, Tenant agrees
18  to pay Landlord an annual rental of Three Thousand Six Hundred
19  Dollars ($3,600.00) to be paid in equal monthly installments
20  of Three Hundred Dollars ($300.00) on the first day of each and
21  every calendar month.

22      (c)  During the fifty-five year Basic Term hereof, Tenant
23  agrees to pay Landlord an annual rent of Twenty-four Thousand
24  Dollars ($24,000.00) (herein called the "Basic Minimum Rent"),
25  or eight percent (8%) of the gross rentals received by the
26  Tenant from his subtenants (herein called the "Percentage
27  Rent"), whichever is greater.

28      (i)  The Basic Minimum Rent is to be paid in equal
29  monthly installments in advance on the first day of each and
30  every calendar month.  If rent commences on a day other than
31  the first day of the month, the rent for the initial fractional
32  month shall be prorated and paid with the rent for the first

-1-



1  full calendar month of such term.  The rent for any other por-
2  tion of any term hereof thereafter which is less than twelve
3  (12) months shall be the proportion of the fixed minimum annual
4  rent above provided which the number of months in such portion
5  of the term bears to twelve (12).

6           (ii)  For each and every monthly period during the
7  term of this lease, Tenant shall pay to Landlord, Percentage
8  Rent on or before the 1st day of the next succeeding month,
9  an amount equal to eight percent (8%) of the gross rentals
10 received that month by the Tenant from his subtenants, less
11 the amount of the monthly Basic Minimum Rent.  If the sum of
12 the aggregate payments made as additional Percentage Rent
13 during any calendar quarter exceeds eight percent (8%) of the
14 gross rentals received during such quarterly period, the Land-
15 lord shall apply the excess toward the Basic Minimum Rent due
16 to be paid by the Tenant.  Provided however, that the Tenant
17 shall never pay less for any lease year than the Basic Minimum
18 Rent provided for above and under the terms of the lease, and
19 at the expiration of the last quarterly period, that any excess
20 rental payments shall be refunded to Tenant.

21         The term "gross rentals received by the Tenant from his
22 subtenants" shall not include each subtenant's share of real
23 property taxes, insurance, maintenance, etc., whether billed
24 or assessed separately or jointly and the term "subtenants"
25 shall include "sublessees".  If Tenant uses any portion of the
26 leased premises for its own use or benefit, a rental value that
27 is customary for the space so used shall be assigned to said
28 space and added to the "gross rentals received by the Tenant
29 from his subtenants" for purposes of computing the Percentage Rent.
30         Within thirty (30) days after the end of each quarterly
31 period, Tenant shall cause a statement of the gross rentals for such
32 period to be certified by Tenant.  Within thirty (30) days after

-4-



J & R Developments, LLC

*A Limited Liability Corporation*



**To :** ARCH PUGH

**Company :**

**Fax Number :** 530-246-3816

**RE :** SHOPPING CENTER LEASE

RICHARD W. MERRILL, P.E.
**From :** *Registered Consulting Civil Engineer*
California Registration No. 28101

**Date :** 5/27/14

**Total Pages :** 5

**Sender's Reference No :**
208-288-0628

**Your Reference No :**

**Notes/Comments :**

Fixed PAGES 4 & 3Ha from bASIC LEASE
And pAGES from third Addendum 2 & 4.

*Rick*

Richard W. Merrill
2123 West Divide Creek St.
Meridian, ID 83646
Res: 208-288-0628

*2nd Addendum*

"(d)   Renewal Terms.

"If Tenant is not in default in the performance of any obligation hereunder, Tenant shall have the option to extend the Basic Term of this lease for four (4) consecutive renewal terms of five (5) years each, by giving Landlord notice of its election to do so not less than one hundred twenty (120) days prior to the expiration of the then existing term.  Should any option to extend the term hereof not be exercised, there shall be no right thereafter to exercise any option to extend the term hereof.  A new lease need not be executed upon the exercise of any such option, but this lease shall remain in full force and effect except that there shall be no option to extend the term hereof following the expiration of the fourth (4th) renewal term."

(h)   On Page 3, Lines 22 through 24 are hereby deleted, and the following lines are substituted in place thereof:

"(c)   During the fifty-five year Basic Term hereof, or any renewal term, Tenant agrees to pay Landlord an annual rental of Twenty-Six Thousand Two Hundred Sixty Dollars ($26,260) (herein called the 'Basic Minimum Rent')."

(i)   On Page 4, Line 1 is hereby deleted and the following line is substituted therefore:

"full calendar month of such term.  The basic minimum rent for any other por-".

(j)   On Page 4, Lines 4 and 5 are hereby deleted and the following substituted therefore:

"rent above provided which the number of days in such year bears to three hundred sixty-five (365)."

(k)   On Page 4, Lines 21, 22 and 23 are hereby deleted and the following is hereby inserted in lieu thereof:

"The term  'gross rentals received by the Tenant from its subtenants' shall not include amounts paid by any sub-

-2-

"B) Addendum"

the improvements damaged by an uninsured casualty exceeds
$100,000 plus the ground rent capitalization set forth in this
subparagraph, Tenant shall have the option of rebuilding or
repairing such damaged improvements pursuant to the standards and
procedures set forth herein for repairing or rebuilding when the
damage is caused by an insured casualty, or terminating this
lease upon giving thirty (30) days written notice thereof to
Landlord;  provided, however, such notice must be given within
sixty (60) days of the date of said casualty.  In the event
Tenant so elects to terminate this lease and any lender thereby
forecloses, Tenant shall pay Landlord at the time of giving such
notice of election to terminate a sum of money equal to the
capitalized value at eight per cent (8%), of an average of the
preceding three (3) years ground rental payable hereunder as and
for Landlord's loss of its fee interest in the Shopping Center.

        (p)  On Page 14, the second sentence of the First Para-
graph of Article IX is hereby deleted and the following sentence
inserted in lieu thereof:

        "The Tenant shall operate its shopping center
business on the demised premises during normal business hours
and on normal business days during the lease term unless prevented
from doing so by causes beyond its control, such as fire or other
casualty."

        (q)  On Page 17, Line 31 is hereby deleted and the
following lines substituted in place thereof:

        "Accepted Accounting Principles.  Notwithstanding
the provisions of this subparagraph, if the proposed assignee is
a partnership, the net worth (as defined above) shall include the
net worth of all general partners of such partnership.  And,"

        (r)  On Page 18 (a), the following sentence is hereby
added to subparagraph (v):

        "Provided, however, that rental payments and note

-4-

the end of each annual period, Tenant shall cause a statement of
1  the gross rentals for such yearly period to be certified by a duly
2  licensed Certified Public Accountant.  A copy of the statement so
3  certified shall be mailed to the Landlord within the said thirty
4  (30) day period.  If it is determined by audit or otherwise that
5  any such statement is inaccurate, there shall be an adjustment
6  within five (5) days thereafter to correct the same.  Any infor-
7  mation obtained by Landlord pursuant to the provisions of this
8  lease with respect to the determination of the percentage rent
9  payment or otherwise relating to the business of the shopping
10 center shall be treated as confidential, except in any liti-
11 gation or arbitration proceeding between the parties, and except
12 further that Landlord may divulge such information to a bona
13 fide prospective purchaser or encumbrancer of the premises.
14      (d)  Payments of rental shall be made to Landlord at the
15 address specified in Article XV hereof, or at such other place
16 as Landlord may from time to time in writing direct.
17      (e)  Tenant hereby acknowledges that late payment by
18 Tenant to Landlord of rent and other sums due hereunder will
19 cause Landlord to incur costs not contemplated by this lease,
20 the exact amount of which will be extremely difficult to
21 ascertain.  Such costs include but are not limited to, pro-
22 cessing and accounting and attorney's fees.  Accordingly,
23 if any installment of rent or any other sum due from Tenant shall
24 not be received by Landlord within thirty (30) days after such
25 amount shall be due, unless due to causes beyond Tenant's
26 control, Tenant shall pay to Landlord a late charge equal to
27 ten (10) percent of such overdue amount.

28                    ARTICLE III
29 TAXES AND ASSESSMENTS.
30      Tenant agrees that, commencing with the first day of
31 the Preliminary Term hereof, it will pay all taxes, assessments,
32 impositions, levies and charges of every kind, nature or

-5-

description or any interest, penalty or fine which may be added
for nonpayment, provided that, if by law any tax or assessment
may at the option of the taxpayer be paid in installments,
Tenant may exercise such option, and in such event Tenant shall
give Landlord prompt written notice of such exercise.  Landlord
will join in any application by Tenant (and will take such other
action) as may be required to enable Tenant to exercise the
right granted by this article to pay any tax or assessment in in
stallments.  Tenant will furnish Landlord, upon request, for
inspection, within thirty (30) days after the date when any tax
or assessment would become delinquent, official receipts of the
appropriate taxing authority or other proof satisfactory to Land-
lord evidencing the payment of such tax or assessment.

Tenant shall have the privilege, before delinquency occurs,
of contesting, objecting to, or opposing the legality or
validity of any tax, assessments, imposition, or charge pro-
vided that prompt notice of such contest, objection or opposi-
tion shall be given to Landlord by Tenant at least fifteen
(15) days before any delinquency.  In the event of such contest,
objection or opposition, Landlord will cooperate with Tenant
as is necessary and Tenant agrees, within fifteen (15) days
after any final determination thereof adverse to Tenant, to
fully pay and discharge the amounts involved in or affected by
such contest, together with any penalties, fines, interest,
costs, or expenses that may have accrued thereon.

The taxes, assessments, impositions, levies, and charges
which Tenant is obliged to pay pursuant to this section
shall only be those levied or assessed against the demised
premises, and Tenant shall in no event be required to pay or
discharge any of the following:

(a)  Any estate, inheritance, succession, transfer,
gift or poll tax or taxes of Landlord;

-5-

(b)  Any tax upon or against the rental income or profits
of the Landlord or upon any sale or conveyance or encumbrance
of the demised property made by the Landlord.

(c)  Any tax that may be levied on account of any real
property of the Landlord other than the real property described
in this lease.

(d)  Any franchise, capital stock, excise, social security,
unemployment, sales, use, or withholding tax levied or assessed
against the Landlord or any other tax, assessment, imposition,
levy or charge which has no direct relation to the demised
premises, levied or assessed against the Landlord and not
against the demised premises, which would not become a lien
against the demised premises except for the failure of the
Landlord to pay the same.

(e)  Taxes and assessments for any fractional tax year
at the commencement of the Preliminary Term hereof, or at the
expiration of the term hereof; such taxes and assessments
shall be prorated between the parties hereto upon the basis
that the number of days in such fractional tax year bears
to three hundred sixty-five (365).

ARTICLE IV

CONSTRUCTION OF NEW IMPROVEMENTS
AND GRANT OF EASEMENTS AND STREET AND WATERLINE

Tenant agrees that during the Preliminary Term hereof,
it will construct a modern, first-class shopping center and a
parking area which includes paving, lighting, landscaping,
installation of drainage system, on the demised premises.  The
shopping center shall stand only on the demised premises,
shall be a complete self-contained operating unit containing
adequate utilities and facilities and shall be of a design,
character, and appearance appropriate to, and in keeping with
the locality and with the site on which it is constructed.  Said
new improvements shall be at the sole cost and expense of Tenant

1       All installation and construction to be made by Tenant

2  hereunder shall comply with and be in accordance with applicable

3  building ordinances and laws.

4       Each party hereto grants to the other party for the

5  benefit of said other party, its respective successors, assigns,

6  tenants, customers, and invitees and the customers and invitees

7  of such tenants, and for the benefit of the leased premises and

8  Lessors' adjacent property, the right in common with each other of

9  mutual nonexclusive ingress and egress by vehicular and pedestrian

10  traffic upon, over and across Lessees' and Lessors' parking areas

11  and streets, if any.  Neither party shall erect any buildings,

12  structures, or barricades along any street boundary or along any

13  portion of any boundary line common to the leased premises and

14  Lessors' adjacent property, nor shall either party erect any

15  barricades or structures which prevent or hinder ingress or egress

16  on the leased premises or on Lessors' adjacent property unless

17  required by any governmental authority and/or any construction or

18  permanent lender.

19       Landlord has heretofore entered into a lease with Martin

20  Cooper wherein Landlord is called "Lessors" and Martin Cooper is

21  called "Lessee" which provides, in part as follows:

22    "STREET AND WATERLINE:

23       Lessee, his sublessees and any agents, invitees and

24     licensees of Lessee or his sublessee or sublessees
       shall have a non-exclusive right of ingress and

25     egress over an area one hundred (100) feet in width,
       to be known as "Morgan Way", that is contiguous to

26     the easterly line of the leased premises and a non-
       exclusive right to use the waterline that has been

27     installed.  Lessee may at Lessee's option and at
       Lessee's sole cost and expense, improve and/or

28     extend Morgan Way and/or the waterline provided
       that Lessors will require all future franchisees

29     of their property facing Morgan Way and/or using
       the waterline to covenant to reimburse Lessee for

30     a pro-rata share of the costs, based on front
       footage, that Lessee may have incurred in improving

31     and/or extending Morgan Way and/or the waterline."

32       Tenant agrees to reimburse Martin Cooper for a pro-rata

-41-

1   share of the costs, based on front footage, that Martin Cooper has

2   incurred to the date of signing of this lease in improving and/or

3   extending Morgan Way and/or the waterline.  Tenant further agrees

4   to indemnify and save harmless Landlord from any action brought

5   against Landlord for violation of the preceding sentence.  If at

6   any time during the term of this lease Landlord or any transferee

7   of Landlord, extends Morgan Way to the southerly border of the

8   leased premises, Tenant shall contribute twelve thousand five

9   hundred ($12,500) dollars to the cost of said extension.

10                              ARTICLE V

11  INDEMNIFICATION AND INSURANCE

12              Tenant agrees to pay, and to protect, indemnify and save

13  harmless Landlord from and against, any and all liabilities,

14  damages, costs, expenses (including any and all attorney's fees

15  and expenses of Tenant and any and all attorney's fees and

16  expenses of Landlord), causes of action, suits, claims, demands,

17  or judgments of any nature whatsoever arising from injury to

18  or the death of, persons or the damage to property on the leased

19  premises.

20              Tenant agrees that it will at all times, at its own

21  expense, or cause subtenants at their expense to maintain in

22  force a policy or policies of insurance written by one or

23  more responsible insurance carriers which will insure

24

25

26

27

28

29

30

31

32

                              6(a)

1   Landlord and Tenant's contractual liability hereunder,

2   against liability for injury to persons and/or property and

3   death of person or persons occurring in or about the demised

4   premises.  The liability under such insurance shall be not less

5   than $500,000.00 for any one person injured or killed and not

6   less than $1,000,000.00 for any one incident, and $100,000.00

7   property damage.

8       The minimum amount of liability insurance as herein set

9   forth shall be subject to readjustment every five (5) years to

10  meet insurance needs considered adequate by the Shopping Center

11  industry for comparable shopping centers.

12      Tenant agrees that it will at all times at its own expense

13  or cause subtenants at their expense to keep the demised

14  premises insured against all loss or damage by fire with

15  extended coverage in an amount equal to at least ninety percent

16  (90%) of the full insurable value thereof by policies containing

17  the usual co-insurance clause.  The term "insurable value"

18  shall be deemed to mean the cost of replacement of the improve-

19  ment (not including, however, foundations, excavations, and

20  footings).  Such policy or policies shall be written on a

21  replacement cost basis.  Notwithstanding anything herein

22  contained to the contrary, the Landlord shall at all times

23  be entitled to insurance in an amount sufficient to avoid

24  the effect of co-insurance in the event of partial loss.

25  In the event of any change in co-insurance requirements

26  applicable to the premises by the California Fire Insurance

27  Rating Organization, or any similar body, or by statute, the
                                                or the subtenants
28  policies furnished by the Tenant/shall comply with such changes.

29      Tenant will provide Landlord with certificates of such

30  insurance, which certificates will evidence Tenant's compliance

31  with this Article and will provide that such insurance will not

32  be cancelled except after ten (10) days written notice to

-9-

1  Landlord.

2                           ARTICLE VI

3  FIRE OR OTHER CASUALTY

4        In the event of any damage or loss to said premises during

5  the term hereof by reason of fire or other casualty involving

6  more than $25,000.00, Tenant shall give immediate notice there-

7  of to Landlord.  If any building or improvement on the demised

8  premises or in the course of construction thereon shall at any

9  time during the term hereof be damaged or destroyed by fire or

10  other casualty, Tenant shall promptly repair or rebuild the

11  same at Tenant's expense so as to make the building at least

12  equal in value to the building existing immediately prior to

13  such occurrence and as nearly similar to it in character as

14  shall be practicable and reasonable.  Notwithstanding the

15  immediately preceding sentence, if such fire or other

16  casualty causes a subtenant of Tenant to terminate its lease

17  with Tenant, then and in such event, Tenant shall use its good

18  faith efforts to release and rebuild pursuant to any new lease.

19  Upon the insurance proceeds, if any, exceeding the cost of per-

20  forming   Tenant's obligation, which has been defined just

21  immediately prior hereto, Landlord shall have a first lien

22  thereon for rent, (subject, of course, to any such lien

23  arising under the terms of the permanent financing documents

24  to which this lease shall be subordinated as hereinafter

25  set forth) and expenses relative thereto, in arrears.  The

26  proceeds of all such insurance shall, if in the amount of

27  $100,000.00 or less, be paid to Tenant for application by

28  Tenant as hereinbefore required or if in an amount of more

29  than $100,000.00, be paid to _____

30  _____, as "Insurance Trustee", (or a Trustee de-

31  scribed in Article XII, as the case may be) for  application as

32  hereinafter provided.  The Insurance Trustee (or a Trustee described

                              -10-

1  in ARTICLE XII, as the case may be) shall apply and make available
2  and pay to Tenant the net proceeds of any fire or other casualty
3  insurance paid to the Insurance Trustee (or a Trustee described in
4  ARTICLE XII, as the case may be) for any loss which shall occur
5  during the term hereof, after deducting any costs of collection,
6  including attorney's fees, for such repairing or rebuilding as the
7  same progresses, payments to be made against properly certified
8  vouchers.

9      The Insurance Trustee (or a Trustee described in Article
10  XII, as the case may be) may withhold from each amount so to be
11  paid ten percent (10%) thereof until the work of repairing  or
12  rebuilding shall have been completed and proof has been furnished
13  that no lien or liability has attached or will attach to the
14  demised premises or to Landlord in connection with such repairing
15  or rebuilding, and that the premises are free and clear of security
16  interests of every kind, whereupon the entire balance of the net
17  proceeds of such insurance shall be paid over to Tenant.

18      Notwithstanding the immediately preceding paragraph, if
19  such fire or other casualty causes a subtenant of Tenant/to
20  terminate its lease with Tenant, then and in such event, Tenant
21  shall use its good faith efforts to relesae and rebuild pursuant
22  to any new lease.  If Tenant is unable to release and thus does
23  not repair or rebuild, the insurance proceeds shall be divided
24  between the parties pursuant to the procedure set forth in sub-
25  sections (i), (ii), and (iii)/of Section (b)of ARTICLE XIV.

26      If at any time during the last three years of the Basic
27  Term, the building then on the demised premises shall be so damaged
28  by fire or other casualty that the cost of restoration shall exceed
29  fifty percent (50%) of the replacement value thereof, exclusive of
30  foundations, immediately prior to such damage, either party hereto
31  may, within thirty (30) days of such damage, give notice of its
32  election to terminate this lease, and this lease shall cease and

10(a)

1  come to an end on the date of the expiration of ten (10) days from

2  the delivery of such notice with the same force and effect as if

3  such date were the date herein fixed for the expiration of the term

4  herein demised, and the rent shall be apportioned and paid to the

5  time of such termination.  In such event, Tenant shall have no

6  obligation to repair or rebuild, and the entire insurance proceeds

7  shall be and remain the outright property of Landlord.

8           There shall be an abatement of rent to eight percent

9  (8%) of the gross rentals received by the Tenant from its sub-

10  tenants (without regard to the Basic Minimum Rent) during

-11-

1   such time as is reasonably required for repairs and/or rebuild-

2   ing if the damage or loss by reason of fire or other casualty

3   is more than $100,000.00.

4                              ARTICLE VII

5   GROUND RENTAL, NET LEASE AND LANDLORD NOT TO MAINTAIN.

6        It is distinctly understood and agreed between the parties

7   hereto that the rental hereinabove reserved is a ground rental

8   and that the Landlord shall at all times except as provided in

9   Article VI, be entitled to receive said rental in full, irres-

10  pective of the demolition of or any injury or damage to, or

11  the destruction of, any building or buildings to be constructed

12  by Tenant upon the demised premises, or any future building or

13  buildings and/or improvements, and irrespective of the period

14  of time required for the construction or replacement thereof

15  if such reconstruction or replacement takes place.

16       This lease shall be deemed and construed to be a "net

17  lease" and except as herein otherwise expressly provided, the

18  Landlord shall receive the annual rent and all other payments

19  hereunder to be made by the Tenant free from any charges,

20  assessments, impositions, expenses or deductions of any and

21  every kind or nature whatsoever, except as herein expressly

22  provided.

23       Landlord shall not be required to repair or rebuild, or

24  make any repairs, replacements or renewals of any nature or

25  description whatsoever to the lease premises, whether ordinary

26  or extraordinary, or to maintain the leased premises in any way,

27  and Tenant hereby expressly waives the right to make repairs

28  at the expense of Landlord as provided for in any statute

29  or law in effect at the time of the execution of this lease,

30  or any other statute or law which may be hereafter enacted

31  ///

32  ///

-13-

ARTICLE VIII

TITLE TO NEW IMPROVEMENTS, INSPECTION OF THE PREMISES, AND END OF TERM

Any and all buildings or improvements hereinafter constructed on the demised real property by Tenant in conformity with the provisions of this lease shall be and remain the property of the Tenant during the term of this lease and Tenant, alone, shall determine the use to be made of said buildings or improvements; provided, however, that all of the buildings or improvements that are existing on the demised premises at the termination of this lease shall become the property of Landlord upon such termination, the title to which shall be free of any mortgage or deed of trust.

The Tenant shall permit, subject to any and all lease agreements with Tenant's subtenants, an inspection of the demised premises by the Landlord, or the Landlord's agents or representatives, but the Landlord shall not require such inspection more often than is reasonably necessary, except without limitation, (a) inspections in event of emergency; (b) "follow-up" inspection; (c) inspections by or on behalf of prospective purchasers or fee mortgagees, during business hours, at any time during the base Term; and (d) during the year next preceding the expiration of the lease or within a sixty (60) day period after notice of earlier termination, inspections by or on behalf of prospective tenants. If, during such permitted hours, admission to the premises for the purposes aforesaid cannot be obtained (or, at any time, if an entry shall be deemed necessary for the protection of the property, whether for the benefit of the Tenant or not), the Land-lord, or the Landlord's agents or representatives, may (on such notice as may be reasonable under the circumstances, except that no notice shall be required in event of emergency) enter

-----------

-1-

1  the demised premises and accomplish such purpose.  The pro-

2  visions contained in this Article VIII are not intended to

3  create or increase, and are not to be construed as creating

4  or increasing, any obligations on the Landlord's part hereunder.

5      The Tenant shall, on or before the last day of the term

6  herein demised, or on the sooner termination of this lease,

7  peaceably and quietly leave, surrender, and yield up unto

8  the Landlord all and singular the demised premises broom-clean,

9  together with all alterations, additions, and improvements

10 which may have been made upon the premises in good order and

11 repair except for reasonable wear and tear.

12              ARTICLE IX

13 USE OF PREMISES -- COMPLIANCE WITH LAWS AND REGULATIONS --
   INDEMNIFICATION OF LANDLORD -- RESTRICTED ACTIVITIES.

14      The premises shall be used for a shopping center of not

15 less than 20,000 square feet of leasable area, and shall not

16 exceed forty (40) feet in height exclusive of permanent signs.

17 The Tenant shall operate its shopping center business on the

18 leased premises continuously during the lease term unless

19 prevented from doing so by causes beyond its control, such

20 as fire or other extraordinary casualty.  The Tenant shall

21 use its best efforts to keep the shopping center fully

22 leased during the term hereof.

23      The Tenant hereby agrees that the building or buildings

24 which may at any time exist upon the demised premises shall be

25 used only and exclusively for lawful and legitimate purposes;

26 that said Tenant will not use, nor suffer nor permit any

27 person to use or occupy in any manner whatsoever the leased

28 premises or any buildings or other improvements thereon, or

29 any part thereof, for any extra hazardous purpose, nor for

30 any purpose, nor in any manner or use in violation of any law,

31 ordinance or regulation of the proper governmental authority.

32 Tenant also agrees that the demised premises shall not be

-14-

(c)  Lessee assigns to lessor all subrents and other sums falling due from subtenants, licensees, and concessionaires (herein called subtenants) during any period in which lessor has the right under this lease, whether exercised or not, to reenter the premises for lessee's default, and lessee shall not have any right to such sums during that period. This assignment is subject and subordinate to any and all assignments of the same subrents and other sums made, before the default in question, to a mortgagee under any mortgage permitted by provisions of this lease relating to purchase or construction of improvements. Lessor may at lessor's election reenter the premises and improvements with or without process of law, without terminating this lease, and either or both collect these sums or bring action for the recovery of the sums directly from such obligors. Lessor shall receive and collect all subrents and avails from reletting, applying them: first, to payment of reasonable expenses (including attorneys' fees or brokers' commissions or both) paid or incurred by or on behalf of lessor in recovering possession, placing the premises and improvements in good condition, and preparing or altering the premises or improvements for reletting; second, to the reasonable expense of securing new lessees; third, to the fulfillment of lessee's covenants to the end of the term; and fourth, to lessor's uses and purposes. Lessee shall nevertheless pay to lessor on the due dates specified in this lease the equivalent of all sums required of lessee under this lease, plus lessor's expenses, less the avails of sums assigned and actually collected under this provision. Lessor may proceed to collect either the assigned sums or lessee's balances or both, or any installment or installments of them, either before or after expiration of the term, but the period of

-14(a)-

1   maintained as, nor shall become, a private or public nuisance,
2   and Tenant shall not maintain any nuisance, private or public,
3   upon the demised premises.
4         The Tenant agrees to strictly conform to all laws and
5   ordinances and all orders, regulations and requirements of any
6   and every legal, governmental or military board, body, commis-
7   sion or officer relating to, affecting or controlling the
8   construction, reconstruction, replacement, changes in construc-
9   tion of, repair, maintenance, condition, equipment, protection,
10  occupancy or use of, any and every building, structure or
11  improvement that is, or that may be placed or maintained upon
12  said premises, or relating to, affecting or controlling the
13  improvement, occupancy, use or condition of, or any work or
14  operation in or upon said land and premises or said buildings
15  or improvements, or any sidewalk or street surrounding or
16  adjoining the same.  The Tenant agrees to pay and discharge
17  and to keep the Landlord and the said land and premises and
18  every part thereof and any and every building, structure
19  and improvement thereon, free and harmless from any and every
20  fine, penalty, assessment, charge, cost, expense, outlay or
21  damage that may be charged, adjudged, imposed or assessed,
22  or that may be incurred for a violation of any of said laws,
23  orders, ordinances, or regulations, provided, however, that
24  Tenant shall have the privilege of contesting, objecting to,
25  or opposing the legality or validity of any fine, penalty,
26  assessment, charge, cost, expense, outlay or damage that may
27  arise from Tenant's use of the demised premises.  In the
28  event of such contest, objection or opposition, Tenant agrees,
29  within thirty (30) days after any final determination thereof
30  adverse to Tenant, to fully pay and discharge the amount
31  involved or affected by such contest, together with any penalties,
32  fines, interest, costs, or expenses that may have accrued thereon.

-15-

Landlord has heretofore entered into a lease with Martin

Cooper wherein Landlord is called "Lessors" and Martin Cooper is

called "lessee" which provides in part as follows:

"COMPETITIVE BUSINESS:

Lessors will not, without Lessee's prior written
consent, lease or sell any of the Lessors'
property within a radius of 1,250 feet from the
intersection of the centerline of Lake Street
and the centerline of Interstate Highway 5 for
a period of ten (10) years commencing March 14,
1972, and ending March 13, 1982, for motel or
related travel-lodging facilities unless Arthur
F. MORGAN dies within said period of time in which
case the period will be shortened to a five (5)
year period commencing March 14, 1972 and ending
March 13, 1977."

Subsequently, Landlord has entered into an agreement to lease with

Martin Cooper which provides in part as follows:

"6.   It is hereby agreed that the words "motel
or related travel-lodging facilities" in the
paragraph entitled "COMPETITIVE BUSINESS;" on
line 21, page 15 of said lease do not include a
restaurant or similar eating facility."

Tenant therefore agrees not to engage in the motel or related

travel-lodging facilities business in violation of the restrictive

covenant heretofore mentioned and defined and further agrees to

indemnify and save harmless Landlord from any action brought

against Landlord for violation by Tenant of said restrictive

covenant.

ARTICLE X

MECHANICS' AND OTHER LIENS

Except as to liens arising from work performed pursuant

to Landlord's request which shall be the sole responsibility of

Landlord, Tenant hereby agrees to keep the land herein leased,

and every part thereof, and also the every estate, right, title

and interest therein, or in or to any part thereof, at all

times free and clear of mechanics' liens and other liens for

labor, service, supplies, equipment or materials, and that it

will at all times fully pay and discharge and wholly protect

and save harmless Landlord and all and every estate,

right, title and interest of Landlord in and to all and every

part of said land against any and all demands or claims which

- 15 -

may or could ripen into such liens or labor claims, and against

1   all attorney's fees and costs and any and all expenses,

2   damages or outlays which may be incurred by the landlord or

3   Tenant by reason of, or on account of, any such lien or claims

4   or the assertion or filing thereof.  Tenant agrees that it will

5   promptly, within fifteen (15) days after receipt by Tenant

6   of actual notice thereof, or such time as otherwise allowed

7   by law, cause the same to be cancelled and discharged of record,

8   or at the election and expense of Tenant, shall defend, on

9   behalf of Landlord, but at Tenant's sole cost and expense

10  any action, suit or proceeding which may be brought thereon or

11  for the enforcement of such lien, claims or orders, and Tenant

12  hereby agrees to pay any damages and to discharge any judgements

13  entered therein and to save Landlord harmless from any claims or

14  damages resulting therefrom.  The existence of any mechanics',

15  laborer's, materialman's, supplier's or vendor's lien, or

16  any right in respect thereof shall not constitute a violation

17  of this section if payment is not yet due and payable upon the

18  contract or for the goods or services in respect of which

19  any such lien has arisen.  However, Tenant shall have the

20  privilege of contesting, objecting to, or opposing the legal-

21  ity or validity of such demands, claims, liens, fees and

22  costs, expenses, damages or outlays.  In the event of such con-

23  test, objection or opposition, Tenant agrees, within sixty

24  (60) days after any final determination thereof adverse to

25  Tenant, to fully pay and discharge the amounts involved in

26  or affected by such contest, together with any penalties,

27  fines, interests, costs, or expenses that may have accrued

28  thereon.

29       Insofar as the same may be necessary for the protection

30  of the Landlord's right, the Landlord or its agents shall at

31  all reasonable times have the right to go upon and inspect

32  the premises hereby demised and any and every building erected

1  or constructed or in the course of construction or being repaired,

2  added to, rebuilt or restored thereon, and also to serve or to post

3  and keep posted thereon, or on any part thereof, an notice or

4  notices that may at any time be required or permitted by any law

5  relating to or in anywise affecting the liability of the owner of

6  the said land for labor performed or materials furnished in or

7  about the erection and construction of any building, structure or

8  improvements thereon at the instance of any person other than said

9  owner.  Landlord shall have the right to post notices of non-

10  responsibility on the premises.

11                    ARTICLE XI

12  ASSIGNMENT AND SUBLETTING

13         (a)  Subletting.  Tenant may sublet the leased premises

14  and any improvements it may erect thereon, or any part thereof.

15  Tenant shall not accept directly or indirectly, more than _____

16  months' prepaid rent from any sublease.

17         (b)  Assignment.

18             (i)  During the period commencing upon the date of

19  execution of this lease and continuing for a period of seven (7)

20  years thereafter, if Tenant is not in default hereunder, Tenant

21  shall have the right to assign all of its rights and interests in

22  this lease to a permitted assignee, defined as an assignee who has :

23             (aa)  Integrity and a net worth on the date of

24  assignment of greater than One Million Dollars ($1,000,000),

25  exclusive of personal residences and other assets held for personal

26  purposes, including, but not limited to, personal automobiles,

27  recreational vehicles, household furniture, fixtures and personal

28  effects.  Net worth shall mean the amount by which the total of

29  all assets shall exceed the total of all liabilities, computed

30  by a certified public accountant in accordance with generally

31  accepted accounting principles.  And, A

32             (bb)  The experience and ability to operate and

-17-

1  maintain a successful shopping center or an agent or employee

2  with such experience and ability.

3          (ii)  During the period commencing seven (7) years

4  after the date of execution of this lease and continuing until

5  termination, if Tenant is not in default hereunder, Tenant shall

6  have the right to assign all of its rights and interests in the

7  lease to a permitted assignee defined as an assignee who has:

8              (a)  financial strength and integrity, and

9              (b)  experience and ability, or an agent or

10  employee with experience and ability, to operate and maintain the

11  premises as a successful shopping center.

12          (iii)  The following are conditions precedent to

13  Tenant's right of assignment:

14              (a)  Tenant shall give Landlord reasonable

15  notice of the proposed assignment with appropriate documentation

16  as evidence that the proposed assignee qualifies as a permitted

17  assignee.

18              (b)  The proposed assignee shall, in record-

19  able form, expressly assume all the covenants and conditions of

20  this lease.

21              (c)  Tenant shall pay Landlord the sum of

22  Five Hundred Dollars ($500.00) to enable Landlord adequately to

23  investigate the proposed assignee's qualifications as a permitted

24  assignee.  Landlord shall not be required to account for the use

25  of the sum paid, but Landlord shall refund it in full if Landlord

26  rejects the proposed assignee and the rejection is not sustained

27  by a court of competent jurisdiction.

28          (iv)  The effective date of the assignment shall be

29  thirty (30) days after Tenant's notice of the proposed assignment

30  unless, within that time, Landlord gives notice of a valid objec-

31  tion that the proposed assignee is not a permitted assignee.  Land-

32  lord's failure to give notice within that time shall constitute a

-18-

1   waiver of objection to the assignment.

2               (v)   On any assignment made in accordance with the

3   provisions and conditions of his lease, but not until completion

4   of improvements, funding of the permanent loan, and leasing of

5   eighty per cent (80%) of the shopping center, Tenant shall have no

6   further obligation under this lease and, as between Landlord and

7   Tenant, shall be considered to have assigned to assignee all claims

8   against Landlord arising under this lease.  Nothing herein contained

9   shall be construed to release Tenant from any liability or obliga-

10  tion arising before the effective date of the assignment. *See 3d Amend*

11                        ARTICLE XII

12  SUBORDINATION OF THE FEE

13          The Tenant shall have the right during the term of this

14  lease to subject the demised premises to a construction loan, the

15  proceeds of which shall be applied toward payment of the construc-

16  tion herein provided for.  For this purpose the Tenant may subject

17  the demised premises to a single deed of trust, except as herein-

18  inafter otherwise provided, in the form required by a recognized

19  institutional lender and may require the Landlord to join with the

20  Tenant in the execution and delivery of such deed of trust, which

21  deed of trust shall constitute a lien on the demised premises as

22  well as the buildings and improvements to be erected thereon by the

23  Tenant pursuant to the provisions of this lease, subject, however,

24  to the following:

*See 3d Amend*

14(a)

1

2

3          (a)  The Landlord shall not be liable for the payment of

4  the sum secured by said deed of trust nor for any expenses

5  in connection with the same, and neither such deed of trust nor

6  any instrument collateral thereto shall contain any covenant or

7  other obligation on the Landlord's part to pay such debt, or any

8  part thereof, or to take any affirmative action of any kind

9  whatsoever.  Furthermore, such deed of trust shall expressly

10  provide that the Trustee will seek no money judgement against

11  the Landlord;

12          (b)  The loans (both the construction and permanent loans,

13  secured by said deed of trust shall be made by a commercial

14  or savings bank, trust company, savings and loan institution,

15  insurance company, pension fund, or mortgage company, author-

16  ized to do business in the State of California and shall be non-

17  participating.  Said loans shall not exceed the principal sum

18  of $2,600,000.00, shall bear interest at a rate not in excess

19  of _____ percent and shall be repayable in equal monthly

20  installments over a period not in excess of thirty-five (35)

21  years.  Said deed of trust shall not permit the principal

22  thereof to be increased at any time or for any reason (except

23  in case the Trustee shall advance moneys for payment of taxes,

24  water charges, sewer rents, if any, or insurance, and then only

25  after having given the Landlord at least 10 days' prior written

26  notice of the intention to make such advances) without the

27  written consent of the Landlord first obtained, which consent

28  shall not be unreasonably withheld.

29          (c)  The deed of trust shall expressly provide that

30  the Trustee will give Landlord notice of any default thereunder,

31  the failure to cure which might result in the acceleration of

32  the maturity of the debt secured by said deed of trust, and

-19-

1  that landlord will have ten (10) days after receipt of said

2  notice within which to cure said default if it shall so choose.

3    (d)  The deed of trust shall also expressly provide that

4  in case of the taking of the demised premises by eminent domain

5  the landlord shall be entitled to assert and prosecute a claim in

6  such proceedings for that share of any award, settlement or pay-

7  ment as is described in ARTICLE XIV.

8    (e)  If the term of said deed of trust shall be less than

9  the maximum herein permitted, and shall be what is commonly known

10  as a short term "building loan" or "construction loan" and if the

11  Tenant shall desire to convert such loan into a term expiring no

12  later than herein permitted, the landlord shall cooperate in the

13  same even though the same shall involve the execution and delivery

14  of a deed of trust in addition to the single deed of trust herein

15  provided for and is intended to pay the debt secured by the first

16  deed of trust.  Except as is provided by the terms of this para-

17  graph any such deed of trust and any instrument given in connection

18  therewith shall conform to the requirements of this Article.

19    (f)  The deed of trust shall provide that no default

20  shall occur if :

21    (i)  landlord (or any of the persons named the

22  "landlord") should sell, sell under contract of sale, lease with

23  option to purchase, convey, transfer, dispose of, or further

24  encumber its interest in the property, or any part thereof, or

25  agree so to do voluntarily or involuntarily; or

26    (ii)  landlord (or any of the persons constituting

27  "landlord") should be declared incompetent, become insolvent, make

28  an assignment for the benefit of creditors, be the subject of any

29  bankruptcy proceeding, reorganization, arrangement, insolvency,

30  receivership, liquidation or dissolution proceedings.

31    (g)  Tenant covenants to perform all of the conditions

32  and obligations to be performed by it as the borrower under a deed

-20-

1 under the terms and provisions of all notes, deeds of trusts and
2 loan agreements provided for hereinabove, and that it shall make
3 all payments required thereby and shall not permit any condition
4 of default to exist therewith and that it will indemnify and save
5 landlord harmless from any and all liabilities, loss, cost,
6 obligations, expenses, claims, demands, suits, causes of action or
7 damages of any kind or character by whomsoever claimed, arising
8 from or in any manner related to or connected with any such loan
9 documents.

10      (h)  Tenant's continuing breach of the covenants con-
11 tained in subparagraph (g) of this Section for a period of sixty (60)

-31-

days after demand, that such breach be cured shall constitute a
default of this Lease.  Without prejudice to such right to
declare a default, or waiver of any remedy, Landlord may also
make payment of such defaulted payments or payments to the
Trustee and recover the same from Tenant, or at Landlord's
option, pursue such remedies as are otherwise available to
Landlord under the general default clauses of this Lease agreement

(i)   There shall be in existence at the time the loan
documents are tendered to Landlord for approval and execution,
firm commitments to sublease from financially responsible
subtenants which are sufficient to satisfy the standards and
conditions imposed by the lenders.  Prior to the time the
loan documents are tendered to Landlord, Tenant shall have
delivered to Landlord a summary in writing of the identity,
business, term of years, rental and, upon request, a copy of
the proposed form of lease, as to each proposed sublessee.
Tenant shall advise Landlord fourteen (14) days in advance of
the date that Tenant shall deliver such loan documents to
Landlord.   Upon delivery of such loan documents, Landlord
shall have ten (10) days to execute and return the same (by
Tenant's messenger) to Tenant.

(j)   It is understood that some subtenants may
require that their subleases not depend upon the Tenant's
right hereunder, but that in the event of a default between
Landlord and Tenant hereunder, the Landlord for itself shall
recognize the rights and tenancies embraced in their sub-
leases and be bound to permit and continue the same.  Landlord
does hereby agree to execute any such attornment agreement
upon behalf of any subtenant whose lease shall have been sub-
mitted to Landlord in connection with and as part of Landlord's
execution of loan documents.  In any other case, Landlord shall
not unreasonably withhold approval of a request for attornment



-21(a)-

1        It is understood and agreed between these parties that

2  the terms and provisions of this lease must be approved by an

3  institutional lender(s) that will finance the construction and

4  permanent loans for development of the shopping center.  If such

5  institutional lender should require as a condition of financing

6  any modification of the terms and provisions of this lease, the

7  parties agree that they will by mutual agreement attempt to

8  renegotiate such portions hereof as may be necessary for that

9  purpose.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

-21(b)-

ARTICLE XIII

PRIORITY OF LIEN OR LEASE

Landlord hereby expressly covenants and agrees that the leasehold estate of Tenant hereby created shall, during the term of this lease, be prior to any lien or encumbrance created or imposed or caused or suffered to be created or imposed, by Landlord upon or against said demised premises or any buildings or other improvements located thereon, and that Landlord will not create, cause to be created or permit to remain, and will discharge promptly any lien or encumbrance prior to or on a parity with said leasehold estate. If Landlord creates or imposes, or causes or suffers to be created or imposed, upon or against said demised premises or said buildings or other improvements any lien or encumbrance prior to or on a parity with said leasehold estate and does not release, or cause to be released, such lien or encumbrance, Tenant or any Trustee described in Article XII, may make any payment or take any other action necessary to discharge and release such lien or encumbrance, and shall be entitled to reimbursement from Landlord for any expenses thereby incurred, together with

-22-

1   interest therein at the highest rate permitted by law from the

2   date of incurring such expenses to the date of reimbursement.

3   In the event of failure of Landlord to so reimburse Tenant for

4   said expenses, Tenant may credit the amount of said expenses upon

5   rental installments thereafter payable hereunder.

6   <u>ARTICLE XIV</u>

7   <u>CONDEMNATION</u>

8   (a)  <u>Entire Taking.</u>  If the entire leased premises or

9   any portion thereof which is sufficient to render the remaining

10   portion thereof unsuitable, for the use being made thereof at the

11   time of such condemnation or for any other occupancy consistent

12   with the highest and best use thereof, shall in fact be taken in

13   or by condemnation or other proceedings pursuant to law, or sold

14   in avoidance of such condemnation or other proceedings, (each of

15   which is hereinafter in this section referred to as a "taking"),

16   then Tenant shall give notice to Landlord of its intention to

17   terminate this lease on any date after such taking, but not more

18   than ninety (90) days thereafter, and this lease shall thereupon

19   terminate as of such date.

20   In the event of a taking as aforesaid, and the termination

21   of this lease as a result of such taking, the award, settlement or

22   payment resulting from such taking, (including any award, settle-

23   ment or payment as compensation by way of severance damage

24   suffered by such portion of the demised premises as may not be

25   taken), shall be distributed between the parties hereto as follows:

26   (i)   The first proceeds of any such sale
27         shall be applied to the balance, as of
           the time of the termination of this
28         lease, of any mortgage debt secured by
           the leased premises.

29   (ii)  The next proceeds shall be applied to
30         satisfy any requirements of law, both
           substantive as to any condemnation and to
31         any taking as determined by a court of
           competent jurisdiction.

32   (iii) All remaining proceeds shall then be
         divided between Landlord and Tenant as follows:

-23-

     (aa)  For Landlord:  such share of the award equal to the capitalized value of the rent at a rate of interest equal to that which investments of comparable security earn at the time of the taking, plus or minus the discounted difference between the fair market value of the reversion at the expiration of the lease and the capitalized value of the rent.

     (bb)  For Tenant:  the balance of the award.

    (b)  **Lesser Taking.**  If a lesser portion of the leased premises shall be taken, this lease shall nonetheless continue in full force and effect and Tenant shall promptly repair any damage to the improvements on the leased premises caused by any such partial taking from the condemnation award.  The balance of any such award shall be distributed between the parties hereto pursuant to ARTICLE XIV (a) (iii).

In the event of such lesser taking the base rental rent payable by Tenant to Landlord hereunder, after such taking shall be reduced by a fraction the numerator of which is the number of square feet so taken and the denominator of which is the total of square feet of the leased premises let by this lease.  Such reduction in rental shall be effective as of the date of such taking.

Notwithstanding the immediately preceding paragraphs, if such lesser taking causes a subtenant (which may also mean a "specific tenant" by the lender) of Tenant to terminate its lease with Tenant, then and in that event Tenant shall use its good faith efforts to release and repair any damage to the leased premises of the leased premises caused by any such partial taking _____, or if unable to ____ ___ ____ and will ____ damage, the ____ ____ ____ ___ ___ ____ ___ ___ to the parties _____ as follows:

     (i)  the first proceeds of ___ ____ shall be applied to first, _____ the balance _ of the cost of the taking, of any mortgage debt secured by the leased premises that ___ is _____

-24-

1      of square feet of leasable area
2      taken bears to the total number
      of square feet of leasable area.

3   (ii)  The next proceeds shall be applied
4      to satisfy any requirements of lessee
      with subtenants as to any condemna-
5      tion and/or any taking as determined
      by a court of competent jurisdiction.

6   (iii) All remaining proceeds shall then be
7      divided between Landlord and Tenant
      as follows:

8     (aa) For Landlord; such share of
9     the award equal to the capitalized value
     of the rent at a rate of interest equal
10    to that which investments of comparable
    security earn at the time of the taking,
11   plus or minus the discounted difference
   between the fair market value of the
12   reversion at the expiration of the lease
   and the capitalized value of the rent.

13    (bb) For Tenant the balance of
14   the award.

15  (c)  Temporary Requisition. If the use or occupancy of
16 the leased premises or any part thereof shall be temporarily
17 requisitioned by any governmental authority, civil or military for
18 a period exceeding thirty (30) days, the rent payable under this
19 lease shall be temporarily abated. Landlord shall receive the
20 entire award or payment resulting from such temporary requisition
21 up to and including the amount of Basic Minimum Rent to which
22 Landlord would otherwise be entitled; Tenant shall receive the
23 balance of such award or payment.

24               ARTICLE XV
25 SERVICE OF NOTICE.

26    Any notice or demand or statement or any period that
27 either of the parties hereto may desire to serve as, or in the
28 furtherance of any provision of this lease, will be sufficiently
29 served if the same be enclosed in a sealed envelope, addressed
30 to Landlord, DECIMUS P. HOGAN, Suite 1, 2 - - [ ] Lane, - - - ,
31 California, 96067, with a copy to DECIMUS P. HOGAN, JR.,
32 1007 - 7th Street, Suite 517, Sacramento, California 95814, or as

-55-

ARTICLE XVIII.

QUIET ENJOYMENT

If and so long as Tenant shall pay the rent reserved by
this lease whenever the same shall become due and payable and shall
observe all of the covenants and agreements required by it to be
observed during the term of this lease and shall perform all of
its other obligations hereunder, Landlord agrees that it will not
interfere with the peaceful and quiet occupation and enjoyment of
leased premises by Tenant, which occupation and enjoyment shall
be without hindrance, ejection or molestation by Landlord or anyone
claiming by, through or under Landlord.

ARTICLE XIX

SHORT FORM OF LEASE

The parties agree that a short form of this lease, in substantially the form of the annexed Exhibit C, shall be executed and acknowledged by the parties hereto for the purpose of recording.

-21-

ARTICLE XX

LANDLORD MAY CURE DEFAULTS

If the Tenant shall default in the performance of any covenant contained herein on the Tenant's part to be performed, the Landlord may, after thirty (30) days' notice to the Tenant, or on such notice, if any, as may be reasonable in the circumstance if an emergency exists, perform the same for the account and at the expense of the Tenant.  If the Landlord shall incur any reasonable expense, including attorneys' fees, in instituting, prosecuting or defending any action or proceeding instituted by reason of any default of the Tenant, the Tenant shall reimburse the Landlord for the amount of such expense.  The Landlord's action hereunder shall not be deemed a waiver of the Tenant's default.  Should the Tenant, pursuant to this lease, become obligated to reimburse or otherwise pay the Landlord one or more sums of money in addition to the annual rent, the amount thereof shall be deemed additional rent and may, at the option of the Landlord, be added to any subsequent installment of the annual rent due and payable under this lease, in which event the Landlord shall have the remedies for default in the payment thereof provided by Article XXIII.  The provision of this Article " XX " shall survive the termination of this lease.

-28-

ARTICLE XXI

1 DEFAULTS

2       Each of the following events shall be a default by
3 lessee and a breach of this lease:

4       (a)  Abandonment or surrender of the premises or of the
5 leasehold estate, or failure or refusal to pay when due any
6 installment ...........................  lease to be
7 paid by lessee, or to perform as required or conditioned by any
8 other covenant or condition of this lease.

9       (b)  The subjection of any right or interest of lessee
10 to attachment, execution, or other levy, or to seizure under legal
11 process, if not released within ___ days provided that the
12 foreclosure of any mortgage permitted by provisions of this lease
13 relating to purchase or construction of improvements shall not be
14 construed as a default within the meaning of this paragraph.

15       (c)  The appointment of a receiver to take possession
16 of the premises or improvements or of lessee's interest in the
17 leasehold estate or of lessee's operations on the premises for any
18 reason, including but not limited to, assignment for benefit of
19 creditors or voluntary or involuntary bankruptcy proceedings, but
20 not including receivership  (i)  pursuant to administration of the
21 estate of any deceased or incompetent lessee or of any deceased or
22 incompetent individual member of any lessee, or  (ii)  pursuant to
23 any mortgage permitted by provisions of this lease relating to
24 purchase or construction of improvements, or (iii)  instituted by
25 lessor, the event of default being not the appointment of a
26 receiver at lessor's instance but the event justifying the receiver-
27 ship, if any.

28       (d)  An assignment by lessee for the benefit of creditors
29 or the filing of a voluntary or involuntary petition by or against
30 lessee under any law for the purpose of adjudicating lessee a
31 bankrupt; or for extending time for payment, adjustment, or
32 satisfaction of lessee's liabilities; or for reorganization,

-29-

1  dissolution, or arrangement on account of or to prevent bankruptcy

2  or insolvency; unless the assignment or proceeding, and all

3  consequent orders, adjudications, custodies, and supervisions are

4  dismissed, vacated, or otherwise permanently stayed or terminated

5  within _thirty_ days after the assignment, filing, or other initial

6  event.

7  (e)  Default or delinquency in the payment of any loan

8  secured by a mortgage permitted by this lease to be placed by

9  lessee against lessor's title or the leasehold or both.

ARTICLE XXII

NOTICE AND RIGHT TO CURE

12  (a)  The word "default" in this lease includes breach.

13  (b)  As a precondition to pursuing any remedy for an

14  alleged default by lessee, lessor shall, before pursuing any

15  remedy, give notice of default to lessee and to all qualifying

16  subtenants and mortgagees whose names and addresses were previously

17  given to lessor in a notice or notices from lessee or any qualifying

18  mortgagee stating that the notice was for the purpose of notice

19  under this provision.  A qualifying subtenant is a subtenant in

20  possession under an existing sublease which is proper under this

21  lease.  A qualifying mortgagee is a mortgagee under a mortgage

22  then existing under the provisions of this lease relating to

23  purchase or construction of improvements)  Each notice of default

24  shall specify in detail the alleged event of default and the

25  intended remedy.

26  (c)  Each mortgagee under a mortgage then existing, under

27  provisions of this lease permitting mortgagees relating to purchase

28  or construction of improvements) shall have _thirty_ days after

29  service of notice of default within which, at mortgagee's election,

30  either:

31  (1)  To cure the default if it can be cured by the pay-

32  ment or expenditure of money; or

-10-

*[handwritten: initialled and marginal notations]*

(2) If mortgagee does not elect to cure by the payment
or expenditure of money, or if the default cannot be so cured, to
cause the prompt initiation of foreclosure, to prosecute it
diligently to conclusion, and to perform and comply with all other
covenants and conditions of this lease requiring the payment or
expenditure of money by lessee until the leasehold estate shall
be released or reconveyed from the effect of the mortgage or until
it shall be transferred or assigned pursuant to or in lieu of
foreclosure.

(d) If the alleged default is nonpayment of rent, taxes,
or other sums to be paid by lessee as provided in the Article on
rent, or elsewhere in this lease directed to be paid as rent, lessee
shall have ____ days after notice is given to cure the default.
For the cure of any other default, lessee shall promptly and
diligently after the notice commence curing the default, and shall
have ____ days after notice is given, to complete the cure plus
any additional period that is reasonably required for the curing of
the default.

(e) Any subtenant of the entire premises, and any
subtenant of such a subtenant, shall have the right, at its
election, to cure a curable default under this lease, or under
any mortgage then existing under provisions of this lease (relating
to purchase or construction of improvements), or under both. If
any such subtenant cures all defaults then existing, or if any
such subtenant cures all defaults that are then curable and other
defaults are noncurable, or if all then existing defaults are
noncurable, that subtenant's possession and use shall not be dis-
turbed by lessor or by mortgagee as long as (1) the subtenant
performs his sublease's provisions, (2) the subtenant attorns to
lessor and mortgagee according to their respective interests, and
(3) subsequent defaults are cured as in the above provisions or
are noncurable.

-11-



ARTICLE  XXIII

LESSOR'S REMEDIES — NOTICE OF LESSEE'S DEFAULT — UNAVOIDABLE DELAY

       1.  Lessor's Remedies:

       If any default by lessee shall continue uncured, following

notice of default as required by this lease, for the period appli-

cable to the default under the applicable provision of this lease,

lessor has the following remedies in addition to all other rights

and remedies provided by law or equity, to which lessor may resort

cumulatively or in the alternative:

       (a)  Nonmonetary Remedies:

       (1)  lessor may at lessor's election terminate

this lease by giving lessee notice of termination.  On the giving

of the notice, all lessee's rights in the premises and in all

improvement shall terminate.  Promptly after notice of termination,

lessee shall surrender and vacate the premises and all improvements

in broadclean condition; and lessor may reenter and take possession

of the premises and all remaining improvements and eject all

- 12 -

1  parties in possession or eject some and not others or eject none;
2  provided that no subtenant qualifying under nondisturbance provision
3  of this lease shall be ejected.  Termination under this paragraph
4  shall not relieve lessee from the payment of any sum then due to
5  lessor or from any claim for damages previously accrued or then
6  accruing against lessee.

7      (2)  Lessor may at lessor's election reenter
8  the premises, and, without terminating this lease, at any time
9  and from time to time relet the premises and improvements or any
10  part or parts of them for the account and in the name of lessee
11  or otherwise.

12      Lessor may at lessor's election eject
13  all persons or eject some and not others or eject none; provided
14  that no subtenant qualifying under nondisturbance provisions of
15  this lease shall be ejected.  Lessor shall apply all rents from
16  reletting as in the provision on assignment of subrents.  Any
17  reletting may be for the remainder of the term or for a longer or
18  shorter period.  Lessor may execute any leases made under this
19  provision either in lessor's name or in lessee's name and shall
20  be entitled to all rents from the use, operation, or occupancy of
21  the premises or improvements or both.  Lessee shall nevertheless
22  pay to lessor on the due dates specified in this lease the equiva-
23  lent of all sums required of lessee under this lease, plus lessor's
24  expenses, less the avails of any reletting or attornment.  No act
25  by or on behalf of lessor under this provision shall constitute a
26  termination of this lease unless lessor gives lessee notice of
27  termination.

28      (3)  Lessor may at lessor's election use
29  lessee's personal property and trade fixtures or any of such property
30  and fixtures without compensation and without liability for use
31  or damage, or store them for the account and at the cost of lessee.
32  The election of one remedy for any one term shall not force lessor or

-31-

1  election of any other remedy for another item or for the same

2  item at a later time.

3         (b)  Monetary Remedies:

4              (1)  lessee may [ ] [illegible] lessee's

5  election to each installment of rent [illegible] of

6  installments for any period before termination, [illegible] interest at the

7  rate of _ten_ percent per year from the date of each installment

8  avails of reletting or attorned [illegible]

9  receive, as follows: (1) To lessee [illegible] the avails

10 for the period covered do not exceed the amount [illegible] amount

11 charged to lessee for the same period, and (2) a balance to

12 lessee. lessor shall make reasonable efforts to mitigate lessee's

13 liability under this provision.

14              (2)  [illegible] lessee's

15 election to damages in the following sum: (1) [illegible] amount that

16 would have fallen due or come between the time of termination of

17 this lease and the time of the claim, judgment, or other award, less

18 the avails of all relettings and attornments [illegible] all amounts

19 by which lessor should reasonably have mitigated [illegible] rental

20 [illegible], plus interest on the balance at the rate of _ten_ percent

21 [illegible]; and (2) the "worth" at the time of [illegible], judgment,

22 or other award, of the amount by which the unpaid [illegible] the

23 balance of the term exceeds the then fair rental [illegible] of the

24 premises [illegible] of the near rental value [illegible] encumbered

25 [illegible] and the fair rental [illegible] encumbered

26 by the [illegible], "worth," [illegible] with provision,

27 is computed by discounting the total at the [illegible] rate of the

28 Federal Reserve Bank of San Francisco at the time of the claim,

29 judgment, or award, plus one percent.

30 ...

31 ...

32

1  limitations shall not begin to run on lessee's payment until the
2  due date of the final installment to which lessor is entitled nor
3  shall it begin to run on the payments of the assigned sums until
4  the due date of the final installment due from the respective
5  obligors.
6        2.   Notice of Lessor's Default:
7              Lessor shall not be considered to be in default
8  under this lease unless (1) lessee has given notice specifying the
9  default and (2) lessor has failed for 30 days to cure the default,
10 if it is curable, or to institute and diligently pursue reasonable
11 corrective or ameliorative acts for noncurable defaults.  Lessee
12 shall have the right of termination for lessor's default only after
13 notice to and consent by all mortgagees under mortgages then
14 existing under provisions of this lease (relating to purchase or
15 construction of improvements.)
16       3.   Unavoidable Default Or Delay:
17             Any prevention, delay, nonperformance, or stoppage
18 due to any of the following causes shall excuse nonperformance for
19 a period equal to any such prevention, delay, nonperformance, or
20 stoppage, except the obligations imposed by this lease for the
21 payment of rent, taxes, insurance, or obligations to pay money that
22 are treated as rent.  The causes referred to above are:  strikes,
23 lockouts, labor disputes, failure of power, irresistible superhuman
24 cause, acts of public enemies of this state or of the United States,
25 riots, insurrections, civil commotion, inability to obtain labor
26 or materials or reasonable substitutes for either, governmental
27 restrictions or regulations or controls (except those reasonably
28 foreseeable in connection with the uses contemplated by this lease)
29 casualties not contemplated by insurance provisions of this lease,
30 or other causes beyond the reasonable control of the party obligat
31 to perform.

-35-

ARTICLE XXIV

PERMISSIVE REMOVAL OF TENANT'S PROPERTY

Movable furniture, movable personal property and movable trade fixtures put in at the expense of Tenant or any property which may be installed by any subtenant and which under its sublease may be removed by it, may be removed by Tenant or any subtenant at or before the expiration or sooner termination of this lease, if the removal thereof will not structurally damage the demised premises or if all damage caused by such removal is promptly repaired by Tenant at its sole expense, and if Tenant is not in default under the lease.

ARTICLE XXV

OFF-SITE IMPROVEMENTS AND STREET AND WATERLINE

At the commencement of the Basic Term of this lease, Tenant shall pay Landlord $300.00 multiplied by the number of



- 36 -

1   acres leased to reimburse Landlord for amounts previously
2   paid by Landlord for such off-site improvements as sewer,
3   water and storm drainage.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18                          ARTICLE XXVI
19   FIRST RIGHT OF REFUSAL TO PURCHASE
20          In consideration of the execution of this lease and the
21   investment in the nature of improvements and other economic
22   interests inherent in the leasehold interest created hereby,
23   the Landlord hereby agrees that should Landlord, during the
24   lease term, or any extension thereof, elect to sell all or
25   any portion of the leased premises, the Tenant shall have the
26   right of first refusal to meet any bona fide offer of sale
27   on the same terms and conditions of such offer.  Landlord
28   agrees to submit a copy of such written bona fide offer to
29   Tenant and upon Tenant's failure to meet such offer within
30   forty-five (45) days after actual receipt thereof, the Land-
31   lord shall be free to sell the premises to such third persons
32   in accordance with the terms and conditions thereof, which shall

17.

1. of course, recognize the continuing interests of Tenant under
2. this lease and those of the then mortgagee or beneficiary
3. of the deed of trust.  This paragraph shall not apply to any
4. sale, lease or transfer of the leased premises where the same
5. is to a corporation, trust, trustees, or estate, the stock or
6. ownership of which is owned or beneficially possessed, as to
7. at least a sixty-six and two-thirds percent (66 2/3%) interest,
8. by any of the Lessors, or any of the heirs or spouses of the
9. heirs of LUCILLE F. MORGAN.  If such a transfer to such an entity
10. is made, the transferee(s) shall hold title subject to this
11. lease and in particular this Article XXVI.

12. ARTICLE XXVII

13. MISCELLANEOUS COVENANTS

14.     Each and all of the various rights, powers, options,
15. recourses and remedies of Landlord and Tenant contained or
16. provided for in this lease shall be construed as cumulative
17. and no one of them as exclusive of the other, or as exclusive
18. of any remedies allowed by law.

19.     No delay of Landlord or Tenant in enforcing any right,
20. remedy, privilege or recourse accorded to Landlord or Tenant
21. either by the express term hereof or by law, shall affect,
22. diminish, suspend or exhaust any of such rights, remedies,
23. privileges or recourses.

24.     It is further covenanted and agreed that none of the
25. covenants, terms or conditions of this lease to be kept and
26. performed by Tenant shall in any manner be altered, waived,
27. modified, changed or abandoned, except by a written instrument,
28. duly signed and acknowledged, and delivered by Landlord,
29. and not otherwise, and that no act or acts, omission or
30. omissions, or series of acts or omissions or waiver,
31. acquiescence or forgiveness by Landlord as to any failure
32. of performance either in whole or in part of the Tenant,

1  any of the covenants, terms or conditions of this lease ,

2  shall be deemed, or construed to be a waiver by the Landlord

3  of the right of all of

4  full and complete performance by the Tenant of each and al

5  of the foregoing covenants, terms and conditions thereafter

6  to be performed, according to the provisions of this lease,

7  in the same manner and to the same extent as the same are

8  above covenanted to be performed by the Tenant.

9      Each provision of this lease performable by Tenant

10  shall be deemed both a covenant and a condition.

11      If an assignment of the lease is made pursuant to the

12  provisions of Article XI, Tenant will have no further liability

13  hereunder for covenants, terms or conditions of this lease not

14  kept or performed after the effective date of the assignment.

15      Each and all of the covenants, agreements, obligations,

16  conditions and provisions of this lease shall inure to the

17  benefit of and shall bind (as the case may be) not only the

18  parties hereto, but each and all of the heirs, executors,

19  administrators, successors and assigns of the respective

20  parties hereto, or either of them; and whenever and wherever

21  a reference is made to the Landlord herein or the Tenant

22  herein, such reference shall be deemed to include the

23  respective heirs, administrators, executors, successors and

24  assigns of the Landlord or the Tenant, as the case may be; and

25  all of the promises, covenants, agreements, obligations, con-

26  ditions and provisions contained in this lease shall be con-

27  strued to be, and as, covenants running with the land.

28      In case either party hereto shall institute any suit

29  against the other for violation of any of the covenants or

30  conditions of this lease or should intervene in any action

31  or proceeding wherein the other is a party, in order to enforce

32  or protect its interest or rights hereunder, the party

-39-

1  prevailing in any such action shall receive from the other a

2  reasonable attorney's fee and costs, to be fixed by the Court in

3  such action.

4          Time is of the essence of this lease.

5          EXECUTED by the Landlords, LUCILLE F. MORGAN, in the

6  City of Mount Shasta, State of California, on the _____ day of

7  _____, 1976, by ELIZABETH D. WELSH, as Successor Co-

8  Trustee of the  HERBERT REAM MERRILL Testamentary Trusts, and as

9  Co-Trustee of the LUCILLE F. MORGAN Irrevocable Living Trust Number

10  Two, in the City of Sacramento, State of California, on the _____

11  day of _____, 1976, and by POLLY WELSH McGILVRAY, as

12  Successor Co-Trustee of the HERBERT REAM MERRILL Testamentary

13  Trusts, and as Co-Trustee of the LUCILLE F. MORGAN Irrevocable

14  Living Trust Number Two, in the City of Sacramento, State of

15  California, on the _____ day of _____, 1976; and by Tenant

16  LOUIS A. HABASH and MARY R. HABASH, in the City of _____,

17  State of California, on the _____ day of _____, 1976.

18

19                          _____
20                          LUCILLE F. MORGAN, Landlord.

21  _____   _____
    POLLY WELSH McGILVRAY, as   ELIZABETH D. WELSH, as Successor
22  Successor Co-Trustee of the   Co-Trustee of the Herbert Ream
    Herbert Ream Merrill Testa-   Merrill Trust; and as Co-Trustee
23  mentary Trusts, and as Co-   of the LUCILLE F. MORGAN Irrevocable
    Trustee of the LUCILLE F.   Living Trust Number Two, Landlord.
24  MORGAN Irrevocable Living
    Trust Number Two.
25

26

27  _____
    LOUIS A. HABASH, Tenant.
28

29  _____
    MARY R. HABASH, Tenant.
30

31

32

                        -40-

A parcel of land in the South ½ of Section 16 in
Township 40 North, Range 4 West, M.D.M. and more particularly
described as follows, TO WIT:

Commencing at the center of Section 16 thence,

S 20° 05'54" E, 366.10' thence,

N 67°42'10" E, 95.41' thence,

S 22°17'50" E, 50.00' to the true point of beginning
of this description, thence,

1. S 22°17'50" E, 125.00' thence,
2. N 67°42'10" E, 140.75' to the beginning of a curve
   concave to the Northwest and having a radius of
   1809.91' and a radial bearing N 84°10'33" W, thence,
3. Southerly 66.93' along said curve through a central
   angle 2°07'07", thence,
4. S 7°56'34" W, 849.16' thence,
5. S 89°41'58" E, 50.45' thence,
6. S 7°56'34" W, 225.00' thence,
7. N 83°25'43" W, 548.80' thence,
8. N 28°42'10" E, 299.08' thence,
9. N 22°17'50" W, 194.36' thence,
10. N 16° 35' 12" W, 201.60' thence,
11. N 22° 17' 50 W, 145.00' thence,
12. N 67°42'10" E, 175.00' thence,
13. S 22°17'50" E, 50.00' thence,
14. N 67°42'10" E, 135.00' thence,
15. N 22°17'50" W, 155.00' thence,
16. Through a curve concave to the Southwest having a
    radius of 20.00' a distance of 31.42' and a central
    angle of 90°, thence,
17. N 67°42'10" E, 120.00' thence,
18. Through a curve concave to the Southeast, a distance
    of 31.42' having a radius of 20.00' and a central
    angle of 90°, thence,
19. S 22°17'50" E, 105.00' thence,
20. N 67°42'10" E, 175.00' thence,
21. N 22°17'50" W, 125.00' thence,
22. N 67°42'10" E, 70.41' to the point of beginning.


                    EXHIBIT "A"

That real property situate in the City of Mt. Shasta, County of Siskiyou, State of California, described as:

A portion of land in the North one-half of the South one-half of Section Sixteen of Township Forty North, Range Four West, M.D.M. County of Siskiyou.

Commencing at the one-quarter corner common to Sections 16 and 21 of T. 40 N., R. 4 W., M.D.M.; thence N. 89° 35' 22" W. 419.74 feet to the center line of control line for State Highway as recorded in Book 4 of Record of Surveys at page 2, September 13, 1963; thence along the control line N. 22° 17' 50" W. 1912.40 feet; thence N. 67° 42' 10" E. 1627.18 feet; thence S. 22° 17' 50" E. 50.00 feet to THE TRUE POINT OF BEGINNING of this parcel and being also on the South right of way line of Lake Street; thence S. 67° 42' 10" W. 141.77 feet along said South right of way line of Lake Street; thence S. 22° 17' 50" E. 125.00 feet; thence N. 67° 42' 10" E. 130.33 feet to a point on the westerly right of way line of the Southern Pacific Railroad; thence along said westerly right of way line along a 1809.91 ft. radius curve to the left, from a tangent bearing N. 5° 54' 39" E. through a central angle of 4° 29' 08", a distance of 141.69 feet to a point on the Southerly right of way line of Lake Street; thence along said Southerly right of way line of Lake Street through a 1250 ft. radius curve to the right; through a central angle of 2° 40' 09" a distance of 58.23 feet to the TRUE POINT OF BEGINNING.

LEGAL DESCRIPTION

All that real property situate in the County of Shasta, State of California, described as follows:

A fractional portion of the East 1/2 of the Southwest 1/4 and the West 1/2 of the Southeast 1/4 of Section 16, Township 40 North, Range 4 West, M.D.M., described as follows:

Commencing at the one-quarter corner common to Sections 16 and 21 of Township 40 North, Range 4 West, M.D.M.; thence North 89° 35' 22" West, 419.74 feet to the center line of Control Line for State Highway as recorded in Book 4 of Record of Surveys at page 2, September 13, 1963; thence along the Control Line North 22° 17'50" West 1912.40 feet; thence North 67° 42' 10" East, 1627.18 feet; thence South 22° 17' 50" East 50.00 feet to a point on the southerly line of Lake Street and the True Point of Beginning; said point being the beginning of a curve concave to the Northwest having a central angle of 2° 46' 06" and a radius of 1250.00 feet, a distance of 60.40 feet to a Point on the Westerly line of the Southern Pacific Railroad Co. right of way through a curve concave to the Northwest, having a radial bearing of North 88° 47' 47" West, having a central angle of 6° 34' 11" and a radius of 1800.00 feet, a distance of 207.53 feet; thence South 7° 50' 34" West, 964.16 feet along said Westerly line to a point opposite Engineering Station 8127+89.26; thence S. 89° 41' 53" East 50.45 feet; thence South 7° 56' 34" West, 325.00 feet along said Westerly line; thence N. 83° 25' 43" West, 575.37 feet to a point designated as Point "A" herein; thence North 22° 42' 10" East 403.15 feet; thence N. 22° 17' 50" West, 184.36 feet; thence North 16° 35' 12" West, 201.00 feet; thence North 22° 17' 50" West 145.00 feet to the most Southerly corner of the Standard Oil Company Lease; thence North 67° 42' 10" East, 175.00 feet; thence South 22° 17' 50" East, 50.00 feet; thence North 67° 42' 10" East, 135.00 feet to the most Easterly corner of the Jerry's Lease; thence North 22° 17' 50" West, 155.00 feet to the beginning of a tangent curve concave to the Southwest having a radius of 20.0 feet; thence Westerly along said curve through an angle of 90°, a distance of 31.42 feet to the South line of Lake Street; thence North 67° 42' 10" East, 120.00 feet to a corner on the Texaco Lease; thence from a tangent which bears South 67° 42' 10" West, along a curve concave to the East having a radius of 20.0 feet, through an angle of 90°, a distance of 31.42 feet; thence South 22° 17' 50" East, 105.00 feet; thence North 67° 42' 10" East, 175.00 feet; thence North 22° 17' 50" West, 125.00 feet to the Southerly line of Lake Street, thence North 67° 42' 10" West 212.18 feet to the TRUE POINT OF BEGINNING.

TOGETHER WITH a non-exclusive easement for ingress and egress and public utilities, above and below ground on a strip of land described as follows:

Beginning at a point designated as Point "A" in the above description; thence North 83° 25' 43" West, 33.08 feet, thence North 22° 42' 10" East 393.18 feet; thence North 22° 17' 50" West, 940.23 feet to the most Northerly corner of the Treehouse Motel Lease; thence North 22° 17' 50" West, 75.00 feet to the Southerly line of Lake Street; thence North 67° 42' 10" East, 120.00 feet to a corner on the Standard Oil Company Lease; thence from a tangent which bears South 67° 42' 10" West, along a curve concave to the East, having a radius of 20.0 feet, a central angle of 90° a distance of 31.42 feet; thence South 22° 17' 50" East, 250.00 feet, thence South 16° 35' 12" East, 201.00 feet, thence South 22° 17' 50" East, 184.36 feet; thence South 22° 42' 10" West, 403.15 feet to Point "A" and the point of beginning.

EXHIBIT C

ADDENDUM TO LEASE

1    That certain SHOPPING CENTER GROUND LEASE dated ____
2    _____, 1976, between LUCILLE F. MORGAN, and by
3    ELIZABETH D. WELSH and POLLY WELSH McGILVRAY, as Successor Trustee
4    of the HERBERT REAM MERRILL Testamentary Trust, and by ELIZABETH
5    D. WELSH and POLLY WELSH McGILVRAY, as Co-Trustees of the LUCILLE
6    F. MORGAN Irrevocable Living Trust Number Two, herein called
7    "Landlord," and by LOUIS A. HABASH and MARY R. HABASH, Tenant, is
8    hereby amended as follows:
9          (a)  Tenant recognizes that Landlord has heretofore
10   entered into a lease with Safeway Stores that contains restrictive
11   clauses concerning the establishment of a competing food sales
12   business within 1000 feet of the premises leased to Safeway Stores.
13   Tenant therefore agrees not to engage, or permit a subtenant to
14   engage, in a food sale business in violation of said restrictive
15   covenants and further agrees to indemnify and save harmless
16   Landlord for violation by Tenant of said restrictive covenants.
17         (b)  Tenant recognizes that the property described in
18   EXHIBIT "B" which is attached to the SHOPPING CENTER GROUND LEASE
19   is presently leased to UNION OIL COMPANY OF CALIFORNIA, a Corpora-
20   tion (herein called "UNION").  Upon execution of the SHOPPING
21   CENTER GROUND LEASE and this ADDENDUM TO LEASE, Landlord will
22   mail to UNION an executed "AGREEMENT TO CANCEL LEASE," a copy
23   of which marked Exhibit "A" is attached hereto and incorporated
24   by reference herein.  The parties hereto believe that UNION is
25   eager to terminate its lease and will readily execute the Agree-
26   ment to Cancel Lease.  If, however, UNION refuses to execute said
27   Agreement, the parties hereto agree as follows:

          (i)  The leased premises shall include only
               the property described in Exhibit "A" which
               is attached to the SHOPPING CENTER GROUND LEASE;
               and

          (ii)  No rent shall be payable during the

                              -1-

EXHIBIT "A-2"

1    Preliminary Term of the lease; and

2    (iii)  The annual basic minimum rent payable

3    during the basic term of the lease shall be

4    eighteen-thousand dollars ($18,000).

5    Executed by the Landlords, LUCILLE F. MORGAN, in the City

6    of Mount Shasta, State of California, on the 14th day of October

7    1976, and by ELIZABETH D. WELSH and POLLY WELSH McGILVRAY, as

8    Successor Trustees of the HERBERT REAM MERRILL TESTAMENTARY TRUST,

9    and by ELIZABETH D. WELSH AND POLLY WELSH McGILVRAY, as Co-Trustees

10   of the LUCILLE F. MORGAN IRREVOCABLE LIVING TRUST NUMBER TWO, in

11   the City of Sacramento, State of California, on the 14th day of

12   October, 1976; and by Tenant, LOUIS A. HABASH and

13   MARY R. HABASH, in the City of Sacramento, State of

14   California, on the 14th day of October, 1976.

15

16   _____

17   LUCILLE F. MORGAN, Landlord.

18

19   _____

20   ELIZABETH D. WELSH, as Successor
     Co-Trustee of the Herbert Ream

21   Merrill Trusts, and as Co-Trustee
     of the LUCILLE F. MORGAN

22   Irrevocable Living Trust Number
     Two, Landlord.

23

24   _____
     POLLY WELSH McGILVRAY, as Successor

25   Co-Trustee of the Herbert Ream
     Merrill Trusts, and as Co-Trustee

26   of the LUCILLE F. MORGAN
     Irrevocable Living Trust Number

27   Two, Landlord.

28   _____
     LOUIS A. HABASH, Tenant.

29

30   _____
     MARY R. HABASH, Tenant.

31

32

                              -7-



1  election of any other remedy for another item or for the same

2  item at a later time.

3        (b)  Monetary Remedies;

4              (1)  Lessor shall be entitled at lessor's

5  election to each installment of rent or to any combination of

6  installments for any period before termination, plus interest at th

7  rate of _10%_ percent per year from the due date of each installmen

8  Avails of reletting or attorned subrents shall be applied, when

9  received, as follows:  (1)  To lessor to the extent that the avails

10 for the period covered do not exceed the amount due from and

11 charged to lessee for the same period, and (2) the balance to

12 lessee.  Lessor shall make reasonable efforts to mitigate lessee's

13 liability under this provision.

14             (2)  Lessor shall be entitled at lessor's

15 election to damages in the following sums;  (1)  all amounts that

16 would have fallen due as rent between the time of termination of

17 this lease and the time of the claim, judgment, or other award, les

18 the avails of all relettings and attornments and less all amounts

19 by which lessor should reasonable have mitigated those rental

20 lossess, plus interest on the balance at the rate of _10%_ percent

21 per year; and (2)  the "worth" at the time of the  claim, judgment,

22 or other award, of the amount by which the unpaid rent for the

23 balance of the term exceeds the then fair rental value of the

24 premises at the lower of the fair rental value as then encumbered

25 by the lease and improvements and the fair rental value unencumbere

26 by the lease and improvements.  "Worth," as used in this provision,

27 is computed by discounting the total at the discount rate of the

28 Federal Reserve Bank of San Francisco at the time of the claim,

29 judgment, or award, plus one percent.

30 ---------------

31 ---------------

32 ---------------

-14-

*LEASE*

1    election of any other remedy for another item or for the same
2    item at a later time.

3            (b)  Monetary Remedies:

4                (1)  lessor shall be entitled at lessee's
5    election to each installment of rent or to any combination of
6    installments for any period before termination, plus interest at the
7    rate of __10__ percent per year from the due date of each installment.
8    Avails of reletting or attorned subrents shall be applied, when
9    received, as follows:  (1)  To lessor to the extent that the avails
10   for the period covered do not exceed the amount due from and
11   charged to lessee for the same period, and (2) the balance to
12   lessee.  Lessor shall make reasonable efforts to mitigate lessee's
13   liability under this provision.

14               (2)  lessor shall be entitled at lessor's
15   election to damages in the following sums:  (1)  all amounts that
16   would have fallen due as rent between the time of termination of
17   this lease and the time of the claim, judgment, or other award, less
18   the avails of all relettings and attornments and less all amounts
19   by which lessor should reasonable have mitigated those rental
20   lossess, plus interest on the balance at the rate of __10__ percent
21   per year; and (2)  the "worth" at the time of the  claim, judgment,
22   or other award, of the amount by which the unpaid rent for the
23   balance of the term exceeds the then fair rental value of the
24   premises at the lower of the fair rental value as then encumbered
25   by the lease and improvements and the fair rental value unencumbered
26   by the lease and improvements.  "Worth," as used in this provision,
27   is computed by discounting the total at the discount rate of the
28   federal Reserve Bank of San Francisco at the time of the claim,
29   judgment, or award, plus one percent.

30   -----------------
31   -----------------
32   -----------------

                                34a

LEASE

1  election of any other remedy for another item or for the same
2  item at a later time.

3          (b)   Monetary Remedies:

4                 (1)   Lessor shall be entitled at lessor's
5  election to each installment of rent or to any combination of
6  installments for any period before termination, plus interest at the
7  rate of _____ percent per year from the due date of each installment.
8  Avails of reletting or attorned subrents shall be applied, when
9  received, as follows:  (1)  To lessor to the extent that the avails
10 for the period covered do not exceed the amount due from and
11 charged to lessee for the same period, and (2) the balance to
12 lessee.  Lessor shall make reasonable efforts to mitigate lessee's
13 liability under this provision.

14                 (2)   Lessor shall be entitled at lessor's
15 election to damages in the following sums:  (1)  all amounts that
16 would have fallen due as rent between the time of termination of
17 this lease and the time of the claim, judgment, or other award, less
18 the avails of all relettings and attornments and less all amounts
19 by which lessor should reasonable have mitigated those rental
20 losses, plus interest on the balance at the rate of _____ percent
21 per year; and (2)  the "worth" at the time of the claim, judgment,
22 or other award, of the amount by which the unpaid rent for the
23 balance of the term exceeds the then fair rental value of the
24 premises at the lower of the fair rental value as then encumbered
25 by the lease and improvements and the fair rental value unencumbered
26 by the lease and improvements.  "Worth," as used in this provision,
27 is computed by discounting the total at the discount rate of the
28 Federal Reserve Bank of San Francisco at the time of the claim,
29 judgment, or award, plus one percent.

30 -----------
31 -----------
32 -----------

34a

First Addendum to Lease

RECE̶͟͞

ADDENDUM TO LEASE

1          That certain SHOPPING CENTER GROUND LEASE dated 14th

2   _____, 1976, between LUCILLE F. MORGAN, and by

3   ELIZABETH D. WELSH and POLLY WELSH McGILVRAY, as Successor Trustee

4   of the HERBERT REAM MERRILL Testamentary Trust, and by ELIZABETH

5   D. WELSH and POLLY WELSH McGILVRAY, as Co-Trustees of the LUCILLE

6   F. MORGAN Irrevocable Living Trust Number Two, herein called

7   "Landlord," and by LOUIS A. HABASH and MARY R. HABASH, Tenant, is,

8   hereby amended as follows:

9         (a)   Tenant recognizes that Landlord has heretofore

10  entered into a lease with Safeway Stores that contains restrictive

11  clauses concerning the establishment of a competing food sales

12  business within 1000 feet of the premises leased to Safeway Stores.

13  Tenant therefore agrees not to engage, or permit a subtenant to

14  engage, in a food sale business in violation of said restrictive

15  covenants and further agrees to indemnify and save harmless

16  Landlord for violation by Tenant of said restrictive covenants.

17        (b)   Tenant recognizes that the property described in

18  EXHIBIT "B" which is attached to the SHOPPING CENTER GROUND LEASE

19  is presently leased to UNION OIL COMPANY OF CALIFORNIA, a Corpora-

20  tion (herein called "UNION").  Upon execution of the SHOPPING

21  CENTER GROUND LEASE and this ADDENDUM TO LEASE, Landlord will

22  mail to UNION an executed "AGREEMENT TO CANCEL LEASE," a copy

23  of which marked Exhibit "A" is attached hereto and incorporated

24  by reference herein.  The parties hereto believe that UNION is

25  eager to terminate its lease and will readily execute the Agree-

26  ment to Cancel Lease.  If, however, UNION refuses to execute said

27  Agreement, the parties hereto agree as follows:

       (i)   The leased premises shall include only

          the property described in Exhibit "A" which

          is attached to the SHOPPING CENTER GROUND LEASE;

          and

       (ii)  No rent shall be payable during the

-1-

EXHIBIT "A-2"

1              Preliminary Term of the lease; and

2              (iii)  The annual basic minimum rent payable

3              during the basic term of the lease shall be

4              eighteen-thousand dollars ($18,000).

5            Executed by the Landlords, LUCILLE F. MORGAN, in the City

6 of Mount Shasta, State of California, on the 14th day of October

7 1976, and by ELIZABETH D. WELSH and POLLY WELSH McGILVRAY, as

8 Successor Trustees of the HERBERT REAM MERRILL TESTAMENTARY TRUST,

9 and by ELIZABETH D. WELSH AND POLLY WELSH McGILVRAY, as Co-Trustees

10 of the LUCILLE F. MORGAN IRREVOCABLE LIVING TRUST NUMBER TWO, in

11 the City of Sacramento, State of California, on the 14th day of

12 October           , 1976; and by Tenant, LOUIS A. HABASH and

13 MARY R. HABASH, in the City of Sacramento, State of

14 California, on the 14th day of October          , 1976.

15

16                       _____

17                       LUCILLE F. MORGAN, Landlord.

18

19                       _____

                         ELIZABETH D. WELSH, as Successor

20                       Co-Trustee of the Herbert Ream
                         Merrill Trusts, and as Co-Trustee

21                       of the LUCILLE F. MORGAN
                         Irrevocable Living Trust Number

22                       Two, Landlord.

23                       _____

24                       POLLY WELSH McGILVRAY, as Success
                         Co-Trustee of the Herbert Ream

25                       Merrill Trusts, and as Co-Trustee
                         of the LUCILLE F. MORGAN

26                       Irrevocable Living Trust Number
                         Two, Landlord.

27

28 _____

  LOUIS A. HABASH, Tenant.

29

30 _____

  MARY R. HABASH, Tenant.

31

32

                 -7-

Second Addendum to Lease

SECOND ADDENDUM TO LEASE

1     That certain SHOPPING CENTER GROUND LEASE dated October

2  14, 1976, between LUCILLE F. MORGAN, and by ELIZABETH D. WELSH

3  and POLLY WELSH McGILVRAY, as Successor Trustees of the HERBERT

4  REAM MERRILL Testamentary Trusts, and by ELIZABETH D. WELSH and

5  POLLY WELSH McGILVRAY, as Co-Trustees of the LUCILLE F. MORGAN

6  Irrevocable Living Trust Number Two, herein called "Landlord," and

7  by LOUIS A. HABASH and MARY R. HABASH, Tenant, is hereby amended

8  as follows:

9     (a)  Prepreliminary Term.  A prepreliminary term of this

10  lease shall commence on the date of execution hereof and shall

11  end at midnight ninety (90) days after it commences.  If Tenant

12  has not given Landlord written notice that it intends to construct

13  a shopping center on the demised premises at the expiration of said

14  90-day period, this lease shall terminate, all/rights and obligations

15  of the parties hereto shall also terminate, and the parties shall

16  enter into a written agreement, suitable for recording, evidencing

17  such termination.  During the prepreliminary term hereof, no

18  rentals shall be payable by Tenant under the lease, and Tenant

19  shall not be subject to any provisions of the  Lease except as

20  expressly provided in paragraph (a) of ARTICLE II of the lease.

21     Executed by the Landlords, LUCILLE F. MORGAN, in the

22  City of Sacramento, State of California, on the 14th day of October

23  1976, and by ELIZABETH D. WELSH and POLLY WELSH McGILVRAY, as

24  Successor Trustees of the HERBERT REAM MERRILL TESTAMENTARY TRUSTS,

25  and by ELIZABETH D. WELSH and POLLY WELSH McGILVRAY, as Co-Trustees

26  of the LUCILLE F. MORGAN IRREVOCABLE LIVING TRUST NUMBER TWO, in

27  the City of Sacramento, State of California, on the 14th day of

EXHIBIT "A-3"

1   October, 1976; and by Tenant, LOUIS A. HABASH and MARY H. HABASH,

2   in the City of Sacramento, State of California, on the 14th day

3   of October, 1976.

4

5

6                            LUCILLE F. MORGAN, Landlord.

7

8                            ELIZABETH D. WELSH, as Successor

9                            Co-Trustee of the Herbert Ream
                              Merrill Trusts, and as Co-

10                           Trustee of the LUCILLE F.
                            MORGAN Irrevocable Living Trust

11                           Number Two, Landlord.

12

13                            POLLY WELSH McGILVRAY, as

14                            Successor Co-Trustee of the
                            Herbert Ream Merrill Trusts,

15                           and as Co-Trustee of the
                            LUCILLE F. MORGAN Irrevocable

16                           Living Trust Number Two,
                            Landlord.

17

18

19   LOUIS A. HABASH, Tenant.

20

21   MARY H. HABASH, Tenant.

22

23

24

25

26

27

28

29

30

31

32

-4-

Third Addendum to Lease

_with o synting_

## THIRD ADDENDUM TO LEASE

That certain SHOPPING CENTER GROUND LEASE dated October 14, 1976, between LUCILLE F. MORGAN, and by ELIZABETH D. WELSH and POLLY WELSH McGILVRAY, as Successor Trustees of the HERBERT REAM MERRILL Testamentary Trusts, and by ELIZABETH D. WELSH and POLLY WELSH McGILVRAY, as Co-Trustees of the LUCILLE F. MORGAN Irrevocable Living Trust Number Two, herein called "Landlord" and by LOUIS A. HABASH and MARY R. HABASH, herein called "Tenant", is hereby amended as follows:

(a)  On Page 1, Line 12, the word "Landlord" is hereby deleted and the word "Tenant" substituted in its place.

(b)  On Page 1, Line 16 is hereby deleted and the following line is substituted in place thereof:

"Exhibit 'C' which is attached hereto and".

(c)  On Page 1, Lines 18, 19 and 20 are hereby deleted and the following sentence substituted in place thereof:

"Landlord specifically reserves all mineral rights to such real property, but without right of surface entry above a depth of five hundred (500) feet."

(d)  On Page 1, the words "gives written" on Line 24 and "notice to Landlord of the opening by Tenant of" on Line 25 are hereby deleted and the following word is substituted in place thereof:  "opens".

(e)  On Page 2, the semi-colon at the end of Line 3 is hereby deleted and a period (".") is substituted in place thereof.

(f)  On Page 2, Lines 4 through 16 and the following words on Line 17 are hereby deleted:  "in this subparagraph (b) of this Article 1."

(g)  On Page 2, the following subparagraph is hereby added to Article 1

. . . . .

. . . . .

- 1 -

1   "(d)   Renewal Terms.

2        "If Tenant is not in default in the performance

3   of any obligation hereunder, Tenant shall have the option to

4   extend the Basic Term of this lease for four (4) consecutive

5   renewal terms of five (5) years each, by giving Landlord notice

6   of its election to do so not less than one hundred twenty (120)

7   days prior to the expiration of the then existing term.  Should

8   any option to extend the term hereof not be exercised, there shall

9   be no right thereafter to exercise any option to extend the term

10  hereof.  A new lease need not be executed upon the exercise of any

11  such option, but this lease shall remain in full force and effect

12  except that there shall be no option to extend the term hereof

13  following the expiration of the fourth (4th) renewal term."

14       (h)   On Page 3, Lines 22 through 24 are hereby deleted

15  and the following lines are substituted in place thereof:

16       "(c)   During the fifty-five year Basic Term hereof,

17  or any renewal term, Tenant agrees to pay Landlord an annual

18  rental of Twenty-Six Thousand Two Hundred Sixty Dollars ($26,260)

19  (herein called the 'Basic Minimum Rent'),"

20       (i)   On Page 4, Line 1 is hereby deleted and the follow-

21  ing line is substituted therefore:

22       "full calendar month of such term.   The basic

23  minimum rent for any other pe.c~".

24

25       (j)   On Page 4, Lines 4 and 5 are hereby deleted and the

26  following substituted therefore:

27       "rent above provided which the number of days

28  in such year bears to three hundred sixty-five (365) "

29  

30  and the following is hereby inserted in lieu thereof:

31       "The term  'gross rentals received by the Tenant

32  from its subtenants' shall not include amounts paid by any sub-

tenant to Tenant to reimburse Tenant for Tenant's out-of-pocket costs of operating the shopping center, including, but not limited to, real property taxes, insurance, repairs, maintenance, management fees and utility charges, whether billed...."

(1)  On Page 10, the last two words on Line 10 and Lines 15 through 18 are hereby deleted.

(m)  On Page 10 (a), Line 18 is hereby deleted and the following is substituted therefor:

"Notwithstanding the preceding subparagraphs of this Article VI, if".

(n)  On Page 10 (a), Lines 26 and 27 are hereby deleted and the following is substituted therefor:

"If at any time during the last three years of the then applicable term, the buildings then on the demised premises shall be so damaged...."

(o)  On Page 12, the following provisions are hereby added to Article VI:

"UNINSURED CASUALTY.  Notwithstanding the foregoing provisions of this Article VI, in the event of damage to the improvements caused by a casualty for which insurance is not required under the terms of this lease and for which Tenant has no insurance (herein called an 'uninsured casualty'), Tenant shall have the following rights and obligations:

"(a)  If the damage to the improvements is from an uninsured casualty  the cost of which to rebuild or repair is less than $100,000 plus the amount determined by the ground rent capitalization set forth in subparagraph (b) immediately below, then Tenant shall repair or rebuild such damaged portions of the improvements pursuant to the standards and procedures set forth for repairing or rebuilding the improvements when the damage is caused by an insured casualty as herein set forth.

"(b)  If the cost of repairing or rebuilding

-j-

1  the improvements damaged by an uninsured casualty exceeds
2  $100,000 plus the ground rent capitalization set forth in this
3  subparagraph, Tenant shall have the option of rebuilding or
4  repairing such damaged improvements pursuant to the standards and
5  procedures set forth herein for repairing or rebuilding when the
6  damage is caused by an insured casualty, or terminating this
7  lease upon giving thirty (30) days written notice thereof to
8  Landlord, provided, however, such notice must be given within
9  sixty (60) days of the date of said casualty. In the event
10 Tenant so elects to terminate this lease and any lender thereby
11 forecloses, Tenant shall pay Landlord at the time of giving such
12 notice of election to terminate a sum of money equal to the
13 capitalized value at eight per cent (8%), of an average of the
14 preceding three (3) years ground rental payable hereunder as and
15 for Landlord's loss of its fee interest in the Shopping Center.
16     (p)  On Page 14, the second sentence of the First Para-
17 graph of Article IX is hereby deleted and the following sentence
18 inserted in lieu thereof:
19          "The Tenant shall operate its shopping center
20 business on the demised premises during normal business hours
21 and on normal business days during the lease term unless prevented
22 from doing so by causes beyond its control, such as fire or other
23 casualty."
24     (q)  On Page 17, Line 31 is hereby deleted and the
25 following lines substituted in place thereof:
26          "Accepted Accounting Principles. Notwithstanding
27 the provisions of this subparagraph, if the proposed assignee is
28 a partnership, the net worth (as defined above) shall include the
29 ...
30     (r)  On Page 18 (a), the following sentence is hereby
31 added to subparagraph (v):
32          "Provided, however, that rental payments and more

1   payments of the Tenant which become due after the date of any

2   such assignment shall not be considered as arising before the

3   effective date of the assignment."

4       (s)  On Page 18(a), the first full paragraph of Article

5   XII is hereby deleted in its entirety and the following paragraph

6   inserted in lieu thereof:

7               "ARTICLE XII

8          "SUBORDINATION OF THE FEE

9       "If Tenant is not in default hereunder, Landlord shall,

10  promptly after notice of request from Tenant (as provided in

11  subparagraph (i) hereof), execute and deliver a deed of trust,

12  or other security instrument (herein sometimes called 'mortgage')

13  sufficient to subordinate, to the lien of a first encumbrance

14  represented by the mortgage, Landlord's fee title (which shall be

15  considered to include fee title in the premises or any part or

16  parts of the premises, (including all rights and appurtenances),

17  and the leasehold hereby created, together with all rents and

18  other benefits due to Landlord under this lease, and shall execute

19  and deliver such construction loan agreements and other instruments

20  as the lender or title company shall require to enable Tenant to

21  obtain construction, take-out and other financing as hereinafter

22  set forth.  As used in this paragraph, construction financing

23  means interim or short-term financing as limited by the conditions

24  below;  take-out financing means permanent or long-term financing,

25  the proceeds of which, in whole or in part, are to repay and

26  discharge the construction loan.  Nothing in this provision shall

27  be construed to require Tenant to divide the financing into

28  construction and take-out loans instead of a single, long-term

     loan.  The provision of this paragraph shall be subject to the

30  following conditions:".

31      (t)  On Page 19, Line 4 is hereby deleted and the follow-

32  ing is substituted therefor:

1    "the sum secured by any deed of trust, mortgage,
2    construction loan agreement or other such security instrument
3    (herein called 'deed of trust');"

4        (u)  On Page 19, subparagraph (b) of Article XII, Lines
5    12 through 28 are hereby deleted and the following new sub-
6    paragraph (b) is substituted in place thereof:

7        "(b)  Any such loans (including but not limited to
8    construction loans and permanent loans) secured by said deeds of
9    trust shall be made by any commercial or savings bank, savings
10   and loan institution, insurance company, pension fund or mortgage
11   company, authorized to do business in the State of California and
12   shall comply with the following terms.

13       "(i)  Any construction loan shall not exceed
14   the principal sum of Two Million Six Hundred Thousand Dollars,
15   ($2,600,000) plus advances made, after giving Landlord ten (10)
16   days prior written notice of its intention to make such advances,
17   by the lender to protect its security (i.e., for taxes, insurance
18   premiums, etc.) shall bear interest at a rate not in excess of ten
19   per cent (10%) per annum, shall be non-amortizing and shall be
20   repayable in full in not less than one (1) year nor more than
21   three (3) years.

22       "(ii)  The initial permanent loan shall not
23   exceed the principal sum of Two Million Six Hundred Thousand
24   Dollars ($2,600,000), plus advances made by the lender to protect
25   its security (i.e., for taxes, insurance premiums, etc.), shall
26   bear interest at a rate not in excess of ten per cent (10%) per
27   annum after any initial interest only period, shall require equal
28   monthly installments of principal and interest based upon an
29   ____ ____ _____ of not more than twenty-eight (28) years
30   and shall require repayment in full in not less than twenty (20)
31   years.

32       (iii)  The principle amount of any loan ____

-6-

1 secured by any such deed of trust may be increased or the shopping
2 center may be refinanced at any time so long as the new principal
3 amount of any loan in excess of the existing loan, plus refinancing
4 charges, is applied to remodeling or adding to existing improvement
5 on the leased premises.  Provided, however, in the case of an arm's
6 length bona fide sale to an unrelated third party, the shopping
7 center may be refinanced if the purchaser pays at least One Million
8 Dollars ($1,000,000) cash as its equity investment and the total
9 loan, plus refinancing charges, does not exceed seventy-five per
10 cent (75%) of the total sales price.  If Tenant wishes to increase
11 principal and/or refinance the shopping center, the principal and
12 interest amount of any such loan or loans shall be limited by the
13 following formula:

   a. - (b. + c.) = d. (a. minus b. and c. must be
   equal to or greater than d.)

   a.  The average of the three (3) prior years' gross
   rental received by Tenant from its subtenants (as
   defined in paragraph (k) of this Third Addendum
   to Lease).

   b.  Two times the average of the three (3) prior years'
   ground rental payable Landlord hereunder.

   c.  The average of Tenant's five (5) prior years'
   expenses in connection with the leased premises
   exclusive of any subtenant contributions.

   d.  The total annual debt service on the loan or loans.

   "If major remodeling or an addition to the
property is contemplated to accommodate a new subtenant, then any
increase in rent resulting from the sublease with said new sub-
tenant shall be included in the gross rental figure as per this
paragraph.  Principal and interest shall be payable at times and
on terms as required by the lender, but in equal monthly install-
ments of principal and interest over a period of not less than
twenty (20) nor more than thirty-five (35) years, provided, how-
ever, any such loan or loans may call for full payment of prin-
cipal and interest no sooner than ten (10) years prior to the full

-7-

1  amortization date of said loan or loans.  In any case, all loans
2  shall be fully amortized and any encumbrance discharged or
3  reconveyed at least three (3) years prior to the expiration of
4  the Basic Term or any extension thereof.  Tenant prior to any
5  such increase or refinancing shall provide Landlord with copies
6  of any new leases and also copies of the plans for any contemplated
7  remodeling or additions.  Further, any such increase in principal
8  of the loan or refinancing of the shopping center may take the
9  form of multiple notes and/or deeds of trust and/or an all-
10  inclusive deed of trust (which may be senior or junior one to the
11  other) and shall bear interest at a rate not to exceed the legal
12  interest rate limit (or if none is applicable the rate shall
13  not exceed four (4) percentage points over the prime interest
14  rate then being charged by Bank of America, National Trust &
15  Savings Association in California), so long as there is sufficient
16  net cash flow for debt service under all loans secured by such
17  deeds of trust pursuant to the formula hereinabove set forth in
18  this subparagraph.  Further, Landlord shall be paid on close of
19  escrow from loan proceeds one-tenth (1/10) of one percent (1%)
20  of the principal amount of any such refinancing as a fee for
21  processing all documentation pertaining thereto submitted by or
22  on behalf of Tenant.
23           "In the event of such principal increase or
24  refinancing, Landlord shall subordinate its interest in the
25  demised premises to such loans in the same manner as hereinabove
26  set forth."
27           (v)  On Page 19, Line 29, the first word of subparagraph
28  (c) is hereby deleted and the word "any" substituted in lieu
29  thereof.
30           (w)  On Page 10, subparagraph (d) of Article XII is
31  hereby deleted and the following is inserted in lieu thereof:
32  //

-8-

1   //
2   //
3   //
4   //
5   //
6   //
7   //
8   //
9   //

10      ."(d)   Notwithstanding the provisions of Article VI
11  and Article XIV hereof, Landlord and Tenant agree that any deed of
12  trust permitted by the terms of this Article XII may contain, in
13  substance, the following four provisions:

14          (i)   Trustor will pay when due all monies
15      secured hereby, with interest, in lawful money
16      of the United States.  Trustor will pay at least
17      ten (10) days before delinquency all taxes and
18      assessments affecting said property or any part
19      thereof (including assessments on such property)
20      and upon request deliver to Beneficiary receipts
21      therefor.  Trustor will keep all of said property
22      insured, with loss payable to Beneficiary,
23      against fire and such other hazards and in such
24      companies, on such forms and in such amounts for
25      each hazard as Beneficiary from time to time
26      may require, and deliver all policies, renewals,
27      and premium receipts thereof to Beneficiary at
28      least thirty days before the effective date
29      thereof, and do all things necessary to obtain
30      prompt settlement for each loss or claim covered
31      by any such policy.  Without waiving or curing
32      any default in any obligation hereby secured,

-9-

Beneficiary may deduct and retain from the pro-
ceeds of such insurance the amount of all expense
incurred by it in connection with any such settle-
ment, and shall release, pay or apply the balance
of such proceeds in such order and proportion
as Beneficiary may determine in its absolute
discretion (a)  to Trustor, or (b) on the cost
of restoration, repair or alteration of any or
all of said property to Beneficiary's satis-
faction, or (c) on account of any item of in-
debtedness or obligation hereby secured.  Any
monies released to Trustor or paid or applied
on the cost of restoration, repair or altera-
tion shall in no event be deemed a payment on
the indebtedness hereby secured.  Upon sale of
any of said property for default in performance
of any obligation hereby secured, all unexpired
hazard insurance on the property so sold shall
pass to and  inure to the benefit of the purchaser
of such property at such sale, and Beneficiary
is hereby irrevocably authorized to assign in
Trustor's name to such purchaser all such policies
which may be amended or rewritten to show the
interest of such purchaser.

(ii)  All compensation and every award of
damages in connection with any condemnation for
public use of, or injury to, all or any part of
said property is hereby assigned and shall be
paid to such Beneficiary, which may use, pay or apply
such monies in Beneficiary's absolute discretion
in the same manner and with the same effect as
above provided for disposition of insurance

-15-

proceeds.  Trustor agrees in this connection to
execute such further assignments as Beneficiary
may require.

(iii) That notwithstanding any provisions
herein to the contrary and in particular para-
graph (i) hereof, in the event of any such loss
or damage as therein described to the improve-
ments upon the property encumbered hereby, it is
hereby understood, covenanted and agreed that
Beneficiary shall make the proceeds received under
any such insurance policies as therein described
available for the restoration of the improvements
so damaged, subject to the following conditions:
(a)    that Trustor is not then in default under any
of the terms, covenants and conditions hereof;
(b)    that such restoration is required by the
terms of or is necessary to preserve any and all
space leases which may then be outstanding in
favor of Thrifty Drug, Sprouse Reitz, United
Groceries or any other space tenant which
Beneficiary then deems to be a credit tenant
under Beneficiary's customary loan underwriting
standards and all such leases will continue in
full force and effect for not less than five years
thereafter; (c) that Beneficiary shall first be
given satisfactory proof that such improvements
have been fully restored or that by the expenditure
of such money will be fully restored, free and
clear of all liens except as to this Deed of
Trust; (d) that in the event such proceeds shall
be insufficient to restore or rebuild the said
improvements, Trustor or the space tenant under

-11-

any lease aforesaid shall deposit promptly with Beneficiary funds which, together with the insurance proceeds, shall be sufficient to restore and rebuild the said improvements;

(e)   that in the event Trustor shall fail within a reasonable time to restore or rebuild the said improvements, Beneficiary, at its sole option, may restore or rebuild the said improvements for or on behalf of the Trustor and for such purpose may do all necessary acts;

(f) that waiver of the right of subrogation shall be obtained from any insurer under such policies of insurance who, at that time, claims that no liability exists as to the Trustor or the then owner or the assureds under such policies; (g) that the excess of said insurance proceeds above the amount necessary to complete such restoration shall be applied as hereinbefore provided as a credit upon any portion, as selected by Beneficiary, of the indebtedness secured hereby.  In the event any of the said conditions are not or cannot be satisfied, then the alternate disposition of such insurance proceeds, as provided in paragraph (i) hereof, shall again become applicable.  Under no cir- cumstances shall Beneficiary become personally liable for the fulfillment of the terms, cove- nants and conditions contained in any said space ... the said improvements.

//
//

(iv)   That notwithstanding any provision herein to the contrary and in particular paragraph (ii) hereof, in the event of any damage or taking as hereinbefore described by eminent domain of less than the entire property encumbered hereby, it is hereby understood, covenanted and agreed that Beneficiary shall make available the proceeds of any award received in connection with and in compensation for any such damage or taking for the purpose of restoring so much of the improvements within the said property affected thereby, subject to the following conditions:

(a)   that Trustor is not then in default under any of the terms, covenants or conditions thereof;

(b)   that such restoration is required by the terms of or is necessary to preserve any or all space leases which may then be outstanding in favor of Thrifty Drug, Sprouse Reitz, United Groceries or any other space tenant which Beneficiary then deems to be a credit tenant under Beneficiary's customary loan underwriting standards and all such leases will continue in full force and effect for not less than five (5) years thereafter;   (c)   that Beneficiary shall first be given satisfactory proof that such improvements have been fully restored or that by the expenditure of such money will be fully restored, free and clear of all liens except as to the lien of this Deed of Trust.

(d)   that in the event such award shall be insufficient to restore or rebuild the said improve-

- 11 -

ments, Trustor or the space tenant under the said
lease shall deposit promptly with Beneficiary
funds which, together with the award proceeds,
shall be sufficient to restore and rebuild the
said improvements; (e) that in the event Trustor
shall fail within a reasonable time to restore
or rebuild the said improvements, Beneficiary, at
its sole option, may restore or rebuild the said
improvements for or on behalf of the Trustor and
for such purpose may do all necessary acts; (f)
that the excess of said award not necessary for
completing such restoration shall be applied as
hereinbefore provided as a credit upon any portion,
as selected by any Beneficiary, of the indebted-
ness secured thereby; (g) that the aggregate
monthly minimum rental payable after such restora-
tion by Thrifty Drug Stores, Inc., Sprouse-Reitz
Co., Inc., United Grocers or any other space tenant
which Beneficiary then deems to be a credit tenant
under Beneficiary's customary loan underwriting
standards will not be less than the aggregate
monthly minimum rental payable by such tenants
immediately prior to the damage or taking.

- 14 -

(x)  On Page 20, subparagraph (e) of Article XII, the following sentence is hereby added to such subparagraph:

"Further, Landlord shall execute all documents reasonably and customarily required by any lender or lender's attorney, or by the title company insuring any loan to verify lender's priority position with respect to the fee interest in the subject property."

(y)  On Page 20, Line 19, the first word of subparagraph (f) is hereby deleted and the word "any" substituted in place thereof.

(z)  On Page 22 and 23, Article XIII is hereby deleted and a new Article XIII inserted in its place as follows:

"ARTICLE XIII

"PRIORITY OF LIEN OR LEASE

"Landlord hereby expressly covenants and agrees that the leasehold estate of Tenant hereby created and the lien of any deed of trust referred to in Article XII hereof shall, during the term of this lease, be prior to any lien or encumbrance created or imposed or caused or suffered to be created or imposed, by Landlord upon or against said demised premises or any buildings or other improvements located thereon, and that Landlord will not create, cause to be created or permit to remain, and will discharge promptly any lien or encumbrance prior to or on a parity with said leasehold estate or any such deed of trust.  If Landlord creates or imposes, or causes or suffers to be created or imposed, upon or against said demised premises or said buildings or other improvements any lien or encumbrance prior to or on a parity with said leasehold estate or any such deed of trust and does not release, or cause to be released, such lien or encumbrance, Tenant or any Trustee described in Article XII, or any beneficiary of such Deed of Trust may make any payment or take any other action necessary to discharge and release such

-15-

1  lien or encumbrance, and shall be entitled to reimbursement
2  from Landlord for any expenses thereby incurred, together with
3  interest thereon at the highest rate permitted by law from the
4  date of incurring such expenses to the date of reimbursement.
5  In the event of failure of Landlord to so reimburse Tenant or
6  any such Beneficiary for said expenses, Tenant may credit the
7  amount of said expenses upon rental installments thereafter
8  payable hereunder.  Moreover, any voluntary lien or encumbrance
9  created by Landlord shall expressly provide that the same
10 shall expressly be subordinated to any deed of trust referred to
11 in Article XII hereof which is not in existence on the date
12 such lien or encumbrance is so created by Landlord."

13        (aa).  On Page 29, Line 13, and Lines 23 and 24;  and
14 on Page 30, Lines 22 and 23 and Lines 17 and 28;  and on
15 Page 31, Lines 22 and 23;  and on Page 34(a), Lines 9 and 10;
16 and on Page 35, Lines 14 and 15, the phrase ". . . .relating to
17 purchase or construction of improvements" is hereby modified to
18 read as follows:

19            "relating to the purchase, construction
20            or permanent financing of the improvements."

21        (bb)  On Page 32, Line 31, the phrase ". . . . Broom
22 clean condition" is hereby deleted and the following phrase is
23 hereby inserted in lieu thereof:  ". . . good condition and
24 repair, ordinary wear and tear expected...."

25        Executed by the Landlords, LUCILLE F. MORGAN, in the
26 City of Sacramento, State of California, on this _____ day of
27 March, 1977, and by ELIZABETH D. WELSH and POLLY WELSH McGILVRAY,
28 as Successor Trustees of the HERBERT REAM HERRILL TESTAMENTARY
29 TRUSTS, and by ELIZABETH D. WELSH and POLLY WELSH McGILVRAY
30 as Co-Trustees of the LUCILLE F. MORGAN IRREVOCABLE LIVING TRUST
31 NUMBER TWO, in the City of Sacramento, State of California, this
32 //

-16-

1    _____ day of March, 1977; and by ___ int, LOUIS A. HABASH and
2    MARY R. HABASH, in the City of Sacramento, State of California,
3    on this 4th day of March, 1977.

5                    Landlords:

7                    _____
8                    LUCILLE F. MORGAN, Landlord

10                   _____
11                   ELIZABETH D. WELSH, as Successor
                     Co-Trustee of the Herbert Ream
12                   Merrill Trusts, and as Co-Trustee
                     of the LUCILLE F. MORGAN Irrevocable
13                   Living Trust Number Two, Landlord

14                   _____
15                   POLLY WELSH McGILVRAY, as
                     Successor Co-Trustee of the Herbert
16                   Ream Merrill Trusts, and as Co-Trustee
                     of the LUCILLE F. MORGAN Irrevocable
17                   Living Trust Number Two, Landlord.

18                   Tenants:

19                   _____
20                   LOUIS A. HABASH, Tenant

21                   _____
22                   MARY R. HABASH, Tenant

                            - 17 -

Fourth Addendum to Lease

## FOURTH ADDENDUM TO LEASE

This Fourth Addendum to Lease (this "Fourth Addendum") is made and entered into as of the 9th day of ___October___, 2007, by and between C & K MARKET, INC., an Oregon corporation (by assignment from Raymond L. Nidiffer and M. Jane Nidiffer JTWROS, "Tenant") and ANDREA L. SILVER-MERRILL, as successor trustee of the LUCILLE F. MORGAN IRREVOCABLE LIVING TRUST NUMBER TWO, as to an undivided 88.61% interest, and RICHARD WALTON MERRILL, a single man, as to an undivided 11.39% interest (collectively "Landlord").

## RECITALS

A.     WHEREAS, Tenant and Landlord are parties to that certain Lease dated as of October 14, 1976, as amended by that certain Addendum to Lease dated October 14, 1976, that certain Second Addendum to Lease dated October 14, 1976, that certain Third Addendum to Lease dated March 4, 1977 (herein, as amended and as the same is hereby amended, the "Lease").

B.     WHEREAS, the Tenant and Landlord desire to amend the Lease in certain respects.

C.     NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Tenant and Landlord hereby agree as follows:

1.     Recitals.  The recitals set forth above are true and correct and are hereby incorporated in their entirety.

2.     Definitions.  Capitalized terms used, but not defined herein, shall have the same meanings herein as given to them in the Lease.

3.     Amendment to Lease.  Article XIII of the Lease is hereby amended and restated in its entirety as follows:

### "ARTICLE XIII – LEASEHOLD FINANCING

**Right to Grant Security Interest**

In addition to any rights granted to Tenant under Article XII of this Lease relating to construction and take out financing, Tenant is hereby given the right to grant security interests in this Lease for any purpose without the further consent or approval of Landlord, but subject to the terms of this Lease.  The granting of any such security interest may be accomplished by means of a security agreement evidenced by the filing of a UCC Financing Statement, and/or a recorded deed of trust or mortgage **"Leasehold Mortgage"**.  In no event shall any security interest be granted for any term which extends beyond the expiration of this Lease.  Any such security interest shall be subject to all of the terms and conditions of this Lease and to the rights and interests of Landlord.  Tenant shall promptly give Landlord a written notice of the granting of any security interest in

I

this Lease and a copy of the recorded documents creating the security interest. If Landlord is required to review or sign any document related to any financing on behalf of, or for the benefit of, Tenant, then Tenant shall pay Landlord's reasonable fees, including attorney fees, for reviewing such documents. If so requested, Landlord will use good faith efforts to review, execute, and deliver any such document submitted to it within twenty (20) Business Days. Landlord shall not, however, be obligated to agree to anything beyond what it has agreed to do and what is provided for in this Article XIII.

**Rights of Identified Lenders**

Tenant shall provide Landlord with written notice of the name and address of any lender not governed by Article XII (which shall expressly be any lender not providing construction financing or refinancing of construction financing for improvements on the property governed by this Lease) and a copy of the security instrument entered into with the lender. Once this information has been received by Landlord such lender shall be considered to be an **"Identified Lender"** entitled to the rights and protections of an Identified Lender as set forth in this Article XIII (and Article XXII shall not apply to any Identified Lender), and the Identified Lender's interest in this Lease shall be an **"Identified Lender's Interest."** After receipt of this information, as long as such security interest shall remain unsatisfied of record, or until written notice of satisfaction is given by the holder thereof to Landlord, and as long as the Identified Lender has an office which is located in the United States designated to accept service of any notice or other service of process and the Identified Lender has given Landlord written notice of is office address, the following provisions shall apply:

(a)     **No Termination**

Except as caused by operation of law, or arises from the occurrence of a Default, there shall otherwise be no voluntary cancellation, termination, or surrender of this Lease by Tenant, or acceptance of such voluntary cancellation, termination or surrender by Landlord without, in each case, the prior consent, in writing, of the Identified Lender.

(b)     **Notice to Identified Lender**

Landlord, upon serving Tenant with any notice of (i) a violation of this Lease or an Event of Default under this Lease, or (ii) the termination of this Lease, shall also serve a copy of such notice upon each Identified Lender. Although Landlord shall have no liability for failure to give any notice described above to an Identified Lender, no such notice to Tenant shall be deemed effectively given until written notice has also been given to each Identified Lender to the last address for notices given to Landlord by such Identified Lender. The Identified Lender shall submit any change of address to Landlord in the manner prescribed for giving notices found at Article XV

(c)     **Right to Cure**

Upon the occurrence of any violation of this Lease for which Landlord wishes to declare a Default, if notice of such Default and a right to cure is required to be

given, each Identified Lender shall have the right to cure, or cause to be cured, the violation or Default, and Landlord shall accept such performance by such Identified Lender as if the same had been done by Tenant. Each notice of a Default given by Landlord shall specify the nature of the violation and, if such violation relates to the payment of money, shall state the amounts claimed to be past due. Nothing herein shall require any Identified Lender to cure any Default. No such cure shall constitute an assumption of any liability by such Identified Lender (unless the Identified Lender assumes this Lease or enters into a new lease with Landlord), nor prejudice the right of such Identified Lender and/or Tenant to later contest or continue to contest the validity of the claim of the Default. The Identified Lender shall have the same period of time given to Tenant to cure or commence cure of any violation, as set forth in Article XXII, plus an additional thirty (30) days. If the Identified Lender must first obtain possession in order to cure, and is using its diligent efforts to obtain possession as quickly as possible, then the commencement of the time frame for the Identified Lender's cure period will be delayed until such possession is obtained. Notwithstanding the foregoing, in the case of a Hazardous Substance Release which, in Landlord's judgment, is of a serious nature that requires immediate action, then the identified Lender will be so notified, and if the Identified Lender fails to take immediate appropriate action, Landlord may take such action as it deems appropriate, subject to reimbursement by the identified Lender, pursuant to subsection (d) of Article XIII. Except for the additional time to cure referenced above, an Identified Lender shall have no greater rights to cure than those afforded to Tenant under Article XXII. In the event this Lease is terminated and the Identified Lender (or any assignee pursuant to the exercise of any remedy of the Identified Lender) has not assumed this Lease prior to termination, then as long as the Identified Lender, or the Identified Lender's approved assignee pursuant to subsection (k) of Article XIII, cures all Defaults (except those referenced in subsection (e) of Article XIII) and enters into a new lease with Landlord within the above described additional thirty (30) day cure period, the provisions of this Article XIII shall survive termination of this Lease.

    (d)    **Permanent Assignment of Lease or New Lease Agreement**

        In the event of termination or threatened termination of this Lease due to a Default, Landlord will, at the request of the Identified Lender, (i) if this Lease is not then terminated, allow assignment of this Lease to the Identified Lender or any purchaser, transferee or assignee having an interest pursuant to the exercise of any remedy of the Identified Lender, including but not limited to judicial proceedings, or (ii) if this Lease has been terminated, enter into a new lease with the identified Lender, or purchaser, transferee or assignee, on the same terms and provisions contained herein for the remainder of the Lease Term; but in either instance, effective as of the date of termination of Tenant's rights under this Lease, such assignment or new lease will only be granted to the Identified Lender (or purchaser, transferee or assignee) if all of the following conditions are first met by the Identified Lender:

        (i)    The Identified Lender shall make a written request to Landlord to assume this Lease prior to its termination or to enter into a new lease within the sixty (60) day cure period described in subsection (d)(iii) of this Article XIII. The

date of termination will be set forth in the notice of termination which will be given by Landlord to the Identified Lender at least thirty (30) days in advance of the termination date. Such written request must be accompanied by payment to Landlord of all amounts then due to Landlord under this Lease, which amounts due shall also be specified with particularity in the notice of termination;

(ii)    The Identified Lender shall also reimburse Landlord for any out-of-pocket expenses, including reasonable attorney fees and costs, which Landlord shall have incurred by reason of Tenant's Default, which amounts shall also be specified with particularity in the notice of termination; and

(iii)    The Identified Lender shall promptly cure all of Tenant's Defaults under this Lease of which the Identified Lender has received notice pursuant to subsection (b) of Article XIII (other than status defaults described in subsection (e) of Article XIII) or if a Default is of such a nature that it cannot be completely cured within the cure period specified in subsection (c) of Article XIII, shall begin correction of the Default within such cure period and, thereafter, proceed in good faith and with due diligence to effect the cure as soon as reasonably practical.

(iv)    Any purchaser, transferee or assignee shall meet the qualifications set forth in Article XI(b)(1)(aa) and (bb).

(e)    **Defaults that Identified Lender Is Not Required to Cure**

Nothing herein contained shall require the Identified Lender to cure a Default which occurred by virtue of Tenant's Insolvency; provided, however, that as a condition of assumption of this Lease or entry into a new lease, the Identified Lender must first compensate Landlord for all out-of-pocket losses, damages, expenses, and costs incurred by Landlord as a result of Tenant's Insolvency, and must otherwise comply with this Article XIII. An Identified Lender shall have the right to intervene in any mediation, arbitration, or litigation between Landlord and Tenant that potentially affects the Identified Lender's rights or the value of the security held by the Identified Lender.

(f)    **Limitation on Liability**

No liability for payment or performance of any of Tenant's obligations shall attach to, or be imposed upon, any Identified Lender who does not assume this Lease or enter into a new lease and, in the case of a new lease, only to the extent expressly set forth therein,

(g)    **Rights of Identified Lender Upon Assumption of this Lease**

Upon assumption of this Lease or entry into a new lease, after the Identified Lender has cured or commenced cure of all defaults and reimbursed Landlord for all of its out-of-pocket costs and damages as outlined in subsection (d) of Article XIII, the Identified Lender shall have all of the right and obligations of Tenant under this Lease.

(h)     **Identified Lender's Estoppel Certificate Request**

Landlord, within thirty (30) days after request, in writing, by Tenant or any Identified Lender, shall furnish a written statement, duly acknowledged, stating that this Lease is in full force and effect and unamended, or if there are any amendments, specifying the same; that there are no violations or Events of Default under this Lease by Tenant that are known to Landlord, or if there are any known violations or Events of Default, specifying the same.

(i)     **Consent to Amendments**

Neither this Lease, nor any of the terms hereof may be amended, modified, changed, or canceled without the prior written consent of the Identified Lender, which consent shall not be withheld or delayed unreasonably.

(j)     **Right to Contest Payments**

If the Identified Lender makes any payment to Landlord pursuant to Landlord's wrongful, improper, or mistaken notice or demand, it shall be entitled to the return of any such payment, or portion thereof.

(k)     **Foreclosure or Transfer in Lieu of Foreclosure**

No further consent of Landlord shall be required for the transfer of Tenant's interest in this Lease to an Identified Lender resulting from the foreclosure of an Identified Lender's Interest or a negotiated transfer to an Identified Lender in lieu of foreclosure.

(l)     **Insurance Coverage**

The Identified Lender shall be named as an additional insured on all fire and other hazard insurance coverage carried by Tenant and no change in any such policies shall be permitted without the prior written consent of the Identified Lender, which consent shall not be withheld or delayed unreasonably.  Any proceeds from any hazard loss shall be used first, to pay Landlord any unpaid amounts due under this Lease; second, for the reconstruction of the improvements on the Premises; third, if the Lease is terminated, for the repayment of interest and then principal due and owing under the Leasehold Mortgage, and the remaining balance to be paid to Landlord."

4.     Ramifications.  Except as specifically herein amended, all terms, provisions, conditions and exhibits contained in the Lease are hereby confirmed, ratified and restated and shall remain unmodified and in full force and effect.  In the event that any provision of this Fourth Addendum shall conflict with the terms, provisions, conditions, and exhibits of the Lease, the terms, provisions, conditions and exhibits of this Fourth Addendum shall govern and control.

5.     Governing Law. This Fourth Addendum shall be a contract made under, governed by and construed in accordance with, the terms of the laws of the State of California, without giving effect to its conflict of laws principles.

6.     Counterparts. This Fourth Addendum may be executed in any number of counterparts and by each of the undersigned on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts put together shall constitute but one and the same Fourth Addendum.

7.     Successors and Assigns. This Fourth Addendum shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

8.     Captions. Captions used in this Fourth Addendum are provided for convenience and reference only and should not be used in construing this Fourth Addendum.

[Signatures follow]

IN WITNESS WHEREOF, Landlord and Tenant have executed this Fourth Addendum as of the date first above written.

LANDLORD:

ANDREA L. SILVER-MERRILL, as
Successor Trustee of the Lucille F. Morgan
Irrevocable Living Trust Number Two

RICHARD WALTON MERRILL, a single
man

TENANT:

C & K MARKETS, INC.
an Oregon corporation
d/b/a Ray's Sentry Market

By:

Its:

Fifth Addendum to Lease

RECORDING REQUESTED BY:

ANDREA L. MERRILL

WHEN RECORDED MAIL TO:

ANDREA L. MERRILL
P.O. BOX 219
MOUNT SHASTA, CA
                    96067

COPY Of Document Recorded
On 9-30-14 As No. 14-0008402
Has Not Been Compared With Original.
SISKIYOU COUNTY RECORDER

THIS SPACE FOR RECORDERS USE ONLY

## DOCUMENT TITLE

Fifth Addendum to Lease

Ref. No.   970007596

THIS PAGE IS ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION

ADDITIONAL RECORDING FEE APPLIES

## FIFTH ADDENDUM TO LEASE

This Fifth Addendum to Lease (this "Fifth Amendment") is made and entered into as of August 6, 2014, but to take effect on September 30, 2014 ("Effective Date"), by and between C & K MARKET, INC., an Oregon corporation (by assignment from RAYMOND L. NIDIFFER and M. JANE NIDIFFER JTWROS, "Tenant") and ANDREA L. SILVER-MERRILL, as successor trustee of the LUCILLE F. MORGAN IRREVOCABLE LIVING TRUST NUMBER TWO, as to an undivided 88.61% interest, and RICHARD WALTON MERRILL, a single man, as to an undivided 11.39% interest (collectively "Landlord").

## RECITALS

WHEREAS, Tenant and Landlord are parties to that certain Lease dated as of October 14, 1976, as amended by that certain Addendum to Lease dated October 14, 1976, that certain Second Addendum to Lease dated October 14, 1976, that certain Third Addendum to Lease dated March 4, 1977, and that certain Fourth Addendum to Lease dated October 9, 2007 (herein, as amended and as the same is hereby amended, the "Lease").

WHEREAS, the real property which currently is the subject of the Lease consists of all parcels shown on the survey attached as Exhibit A, including Parcels A and B, as well as blue highlighted Parcels F, G and H and including the green, yellow and pink highlighted areas, but, with the exception of the yellow and pink highlighted areas, excluding Parcels C, D and E;

WHEREAS previously, Tenant agreed to release from the property covered by the lease the blue highlighted areas on Exhibit A (Parcels F, G and H) to allow Landlord to convey those areas to the City of Mt. Shasta; and

WHEREAS, Tenant previously agreed with Landlord to release the yellow and pink highlighted areas of Exhibit A to allow Landlord to increase the areas of Parcel C, D and E by boundary line adjustments, as shown on Exhibit A; and

WHEREAS, the green highlighted 10-foot strip is currently a part of Parcel B and the green highlighted quadrilateral area is currently a part of Parcel A and the parties desire, by boundary line adjustment, to make the 10- foot strip a part of Parcel A and to make the quadrilateral area a part of Parcel B; and

WHEREAS, Landlord and Tenant desire to modify the Lease to change the legal description of the premises to reflect the releases and boundary line adjustments described in the foregoing recitals, the revised legal description being set forth on Exhibit C to this Fifth Addendum to Lease.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Tenant and Landlord hereby agree as follows:

1. _Recitals_. The recitals set forth above are true and correct and are hereby incorporated in their entirety.

2.    Definitions. Capitalized terms used, but not defined herein, shall have the same meanings herein as given to them in the Lease.

3.    Amendment to Lease. As of the Effective Date, Page 1, Line 16 of said Lease (as amended by the Third Addendum to Lease dated March 4, 1977) is amended by substituting a new Exhibit "C" as attached to this Fifth Addendum to Lease in place of and in full substitution of the Exhibit "C" attached to the original Lease. By execution of this Fifth Addendum, all of the parties acknowledge and agree that, as of the Effective Date, the property, as described on the new Exhibit "C" attached hereto, describes the real property that is subject to the Lease and the Tenant relinquishes any right, claim, or interest in any property other than that described in the new Exhibit "C" attached to this Fifth Addendum.

4.    Ramifications. Except as specifically herein amended, all terms, provisions, conditions and exhibits contained in the Lease are hereby confirmed, ratified and restated and shall remain unmodified and in full force and effect. In the event that any provision of this Fifth Addendum shall conflict with the terms, provisions, conditions, and exhibits of the Lease, the terms, provisions, conditions and exhibits of this Fifth Addendum shall govern and control.

5.    Dedications and Boundary Line Adjustment(s). From and after the date of this Fifth Addendum, Tenant shall be primarily responsible for (and shall pay the cost of) completing the dedications to the City of Mt. Shasta and the boundary line adjustment(s) described above. Tenant shall use best efforts to complete the dedications and record the Record of Survey attached hereto as Exhibit "B" no later than October 17, 2014, including without limitation release of the land to be dedicated from any liens by or for the benefit of Tenant. Tenant shall keep Landlord reasonably apprised of its progress and shall reimburse Landlord for its reasonable fees and costs incurred in connection with the dedications and the boundary line adjustment(s) from and after the date of this Fifth Amendment.

6.    Governing Law. This Fifth Addendum shall be a contract made under, governed by and construed in accordance with, the terms of the laws of the State of California, without giving effect to its conflict of laws principles.

7.    Counterparts. This Fifth Addendum may be executed in any number of counterparts and by each of the undersigned on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts put together shall constitute but one and the same Fifth Addendum.

8.    Successors and Assigns. This Fifth Addendum shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

9.    Captions. Captions used in this Fifth Addendum are provided for convenience and reference only and should not be used in construing this Fifth Addendum.

10.   Landlord's Costs. Tenant shall reimburse Landlord for all reasonable legal fees and costs incurred by Landlord in connection with this Fifth Addendum and the Lessor Consent and Estoppel executed concurrently herewith, within ten (10) days after receipt of an invoice or other written request for payment.

2

IN WITNESS WHEREOF, Landlord and Tenant have executed this Fifth Addendum as of the date first above written.

*[signatures on following page]*

LANDLORD:

LUCILLE F. MORGAN IRREVOCABLE
LIVING TRUST NO. 2

By: _____
ANDREA L. SILVER-MERRILL,
Successor Trustee

_____
RICHARD WALTON MERRILL

Signature of Richard Walton
Merrill only notarized.

State of _____IDAHO_____ County of _____ADA_____
Subscribed and sworn before me on _____8.13.2014_____
_____ (Date)
(Notary Signature)
EXP 10-05-2016

TENANT:

C & K MARKET, INC.,
an Oregon Corporation

By: _____
Jimmy M. Martini   James D Martini
Title: Controller

[Notary seal: CINDY BRESHEARS / NOTARY PUBLIC / STATE OF IDAHO]





Exhibit C

All that real property in the City of Mt. Shasta, County of Siskiyou, State of California, described as follows:

PARCEL A

COMMENCING AT the intersection of the centerline of Interstate No. 5 and the centerline of Lake Street as shown on Book 11 of Parcel Maps, page 80, recorded November 4, 1992 in the office of the Siskiyou County Recorder; thence North 67° 42' 52" East along the centerline of Lake Street, a distance of 849.98 feet; thence South 22° 17' 08" East, a distance of 50.00 feet to a point on the Southerly line of said Lake Street; thence South 22° 17' 08" East, a distance of 196.22 feet to the TRUE POINT OF BEGINNING; thence North 86°18'48" East, a distance of 142.55 feet; thence North 3°41'14" West, a distance of 5.37 feet; thence North 86°18'46" East, a distance of 17.83 feet; thence South 3°53'13" East, a distance of 10.41 feet; thence South 82°24'36" East, a distance 184.03 feet; thence North 22°17'08" West, a distance of 323.83 feet to a point on a tangent curve concave to the Southwest, having a radius of 20.00 feet; thence Northwesterly along said curve through a central angle of 90°00'00" for an arc length of 31.42 feet to a point on the Southerly line of Lake Street; thence North 67°42'52" East along said Southerly line of Lake Street, a distance of 119.98 feet to a point on a non-tangent curve concave to the East having a radius of 20.00' and a radial bearing of North 22°17'08" West; thence Southwesterly along said curve through a central angle of 90°00'00" for an arc length of 31.42 feet; thence South 22°17'08" East, a distance of 329.40 feet; thence South 82°39'33" East, a distance of 220.93 feet more or less to the Westerly right of way line of the Union Pacific Railroad; thence South 7°55'07" West, along said Westerly line, a distance of 529.77 feet; thence South 89°41'58" East, a distance of 50.44 feet; thence South 7°55'07" West, a distance of 324.99 feet more or less to the Southeast corner of that certain 16.30 acre parcel as shown on Book 4 of Parcel Maps, page 192, filed in the office of the Siskiyou County Recorder on April 20, 1977; thence North 83°25'42" West along the Southerly line of said parcel, a distance of 574.98 feet; thence North 22°42'52" East a distance of 403.03 feet; thence North 22°17'08" West, a distance of 184.36 feet; thence North 16°34'30" West, a distance of 195.88 feet more or less to the Southerly line of Morgan Way per Volume 778, Official Records, Siskiyou County, pages 791 and 792; thence North 67°42'52" East along said Southerly line, a distance of 0.51 feet to the Easterly line of Morgan Way; thence North 22°17'08" West along said Easterly line, a distance of 78.72 feet the POINT OF BEGINNING.

TOGETHER WITH an easement for ingress, egress and public utilities as shown on that certain map entitled "Parcel Map for L. H. International" filed at the Siskiyou County Recorder's Office on April 20, 1977 in Book 4 of Parcel Maps, page 192, further described as follows:

COMMENCING AT the intersection of the centerline of Interstate No. 5 and the centerline of Lake Street as shown on Book 11 of Parcel Maps, page 80, recorded November 4, 1992 in the office of the Siskiyou County Recorder; thence North 67° 42' 52" East along the centerline of Lake Street, a distance of 849.98 feet; thence South 22° 17' 08" East, a distance of 50.00 feet to a point on the Southerly line of said Lake Street;

IF " DOCVARIABLE "SWDocIDLocation" 4 = "4" "034518.00012 5760973\3" "" 034518.00012 5760973\3

thence South 22° 17'08" East, a distance of 324.93 feet; thence South 67°42'52" West, a distance of 0.52 feet to the TRUE POINT OF BEGINNING; thence South 16°34'30" East, a distance of 195.83 feet; thence South 22°17'08" East, a distance of 184.36 feet; thence South 22°42'52" West, a distance of 403.03 feet; thence North 83°25'37" West, a distance of 83.26 feet; thence North 22°42'52" East, a distance of 393.05 feet; thence North 22°17'08" West, a distance of 621.08 feet more or less to a point on the Southerly line of Lake Street, said point being on a curve concave to the Southwest, having a radius of 20.00 feet and a radial bearing of North 22°17'08" West; thence Southeasterly along said curve through a central angle of 90°00'00" for an arc distance of 31.42 feet; thence South 22°17'08" East, a distance of 254.94 feet; thence North 67° 42' 52" East, a distance of 79.48 feet to the POINT OF BEGINNING

Containing 10.73 acres, more or less.

## Parcel B

COMMENCING AT the intersection of the centerline of Interstate No. 5 and the centerline of Lake Street as shown on Book 11 of Parcel Maps, page 80, filed November 4, 1992 in the office of the Siskiyou County Recorder, thence North 67°42'52" East along the centerline of Lake Street, a distance of 1414.63 feet; thence South 22°17'08" East, a distance of 50.00 feet to a point on the Southerly line of said Lake Street and the POINT OF BEGINNING for this description; thence North 67°42'52" East along said Southerly line of Lake Street, a distance of 211.76 feet to a tangent curve concave to the Northwest and having a radius of 1249.72 feet; thence Northeasterly along said curve through a central angle of 2°11'49" for an arc distance of 47.92 feet to a point on a line parallel with the Westerly line of the Southern Pacific Railroad Right of Way, according to Book 21 of Deeds, page 201, said parallel line lying 16.00 feet Westerly, as measured perpendicular to said Westerly line, said point being on a curve concave to the West, having a radius of 1799.48 feet and a radial bearing of South 88°58'19" East; thence Southerly along said curve and parallel line through a central of 6°33'26" for an arc distance of 205.94 feet; thence continuing along said parallel line South 7°55'07" West, a distance of 141.55 feet; thence South 67°42'52" West, a distance of 57.85 feet; thence South 7°55'07" West, a distance of 103.51 feet; thence North 82°39'33" West, a distance of 115.06 feet; thence North 22°17'08" West, a distance of 32.58 feet; thence South 67°42'52" West, a distance of 60.00 feet; thence North 22°17'08" West, a distance of 149.97 feet; thence North 67°42'52" East, a distance of 174.69 feet; thence North 22°17'08" West a distance of 154.96 feet to the POINT OF BEGINNING

Containing 2.06 acres more or less.

BASIS OF BEARINGS derived from the California State Plane Coordinate System, Zone 1, North American Datum of 1983, Epoch 2011.00.

Distances for this description are Grid. Multiply Grid distances by 1.00023400 to obtain ground distances.



## CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

File No. ()

STATE OF   California                    )SS        APN No:
COUNTY OF  _Siskiyou_                    )

On _8/4/11_ before me, _Rene A. Guillaume_ , Notary Public, personally appeared _Andrea Lavonne Merril & James A. Martini_
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Rene A. Guillaume_

This area for official notarial seal.

### OPTIONAL SECTION
### CAPACITY CLAIMED BY SIGNER

Though statute does not require the Notary to fill in the data below, doing so may prove invaluable to persons relying on the documents.

[ ] INDIVIDUAL
[ ] CORPORATE OFFICER(S)   TITLE(S)
[ ] PARTNER(S)        [ ] LIMITED        [ ] GENERAL
[ ] ATTORNEY-IN-FACT
[ ] TRUSTEE(S)
[ ] GUARDIAN/CONSERVATOR
[ ] OTHER

SIGNER IS REPRESENTING.

Name of Person or Entity                    Name of Person or Entity

### OPTIONAL SECTION

Though the data requested here is not required by law, it could prevent fraudulent reattachment of this form.

### THIS CERTIFICATE MUST BE ATTACHED TO THE DOCUMENT DESCRIBED BELOW

TITLE OR TYPE OF DOCUMENT _____
NUMBER OF PAGES _____  DATE OF DOCUMENT _____
SIGNER(S) OTHER THAN NAMED ABOVE _____



